**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:       :      Chapter 11

Lucky Brand Dungarees, LLC, *et al.*,[1]    :      Case No. 20-11768 (CSS)

         Debtors.       :      (Jointly Administered)

------------------------------------------------------- x

## PROPOSED DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION FOR LUCKY BRAND DUNGAREES, LLC AND ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**LATHAM & WATKINS LLP**

George A. Davis (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

-and-

Ted A. Dillman (admitted *pro hac vice*)
Christina M. Craige (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Andrew L. Magaziner (No. 5426)
Joseph M. Mulvihill (No. 6061)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Lucky Brand Dungarees, LLC (3823), LBD Parent Holdings, LLC (4563), Lucky Brand Dungarees Stores, LLC (7295), Lucky PR, LLC (9578), and LBD Intermediate Holdings, LLC (7702). The Debtors' address is 540 S Santa Fe Avenue, Los Angeles, California 90013.

Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

*Counsel to the Debtors and Debtors-in-Possession*

Dated:  August 28, 2020
Wilmington, Delaware

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................... 3

    A.    VOTING PROCEDURES ............................................................................ 4

    B.    DISCLOSURE STATEMENT EXHIBITS ................................................ 5

    C.    THE DEBTORS' PROFESSIONALS .......................................................... 5

    D.    IMPORTANT DATES ................................................................................ 5

    E.    BRIEF OVERVIEW OF THE PLAN ........................................................ 6

    F.    SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY .................... 6

    G.    CONFIRMATION UNDER SECTION 1129(B) ........................................ 8

    H.    CONFIRMATION HEARING ................................................................ 8

II. OVERVIEW OF THE DEBTORS' PREPETITION OPERATIONS ....................... 9

    A.    OVERVIEW OF THE DEBTORS' PRE-SALE BUSINESSES............................ 9
        1.    Direct to Consumer Business .................................................. 9
        2.    Wholesale Business .................................................................. 9
        3.    Licensing Business.................................................................... 9

    B.    PREPETITION ORGANIZATIONAL AND CAPITAL STRUCTURE............... 9
        1.    Secured Debt – First Lien Credit Agreement and Second Lien Credit
            Agreements .............................................................................. 10
            (a)    First Lien Credit Agreement ........................................ 10
            (b)    Second Lien Term Loan A Credit Agreement .............. 11
            (c)    Second Lien Term Loan B Credit Agreement .............. 11
        2.    The Second Lien Pari Passu Intercreditor Agreement ............... 12
        3.    Preferred Units and Common Units........................................ 12
        4.    Unsecured Debt ...................................................................... 12

III. KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11
    CASES ........................................................................................................... 13

    A.    OVERVIEW ............................................................................................ 13

IV. THE CHAPTER 11 CASES ...................................................................................... 14

    A.    FIRST DAY PLEADINGS........................................................................ 14

    B.    DEBTOR-IN-POSSESSION FINANCING ............................................. 14

C.      STORE CLOSING MOTION ...................................................................15

D.      FORMATION OF THE CREDITORS' COMMITTEE ....................................15

E.      SALE TRANSACTION ....................................................................16

F.      COMMITTEE INVESTIGATION AND SETTLEMENT ..............................17

G.      SCHEDULES AND BAR DATES ........................................................18

V. THE PLAN .................................................................................................19

A.      INTRODUCTION ............................................................................19

B.      CLASSIFICATION AND TREATMENT OF CLAIMS AND
        INTERESTS UNDER THE PLAN ......................................................19

C.      UNCLASSIFIED CLAIMS ................................................................21
        1.      Administrative Claims .......................................................21
        2.      Professional Fee Claims .....................................................21
        3.      Statutory Fees .................................................................22
        4.      Priority Tax Claims ..........................................................22

D.      CLASSIFICATION OF CLAIMS AND INTERESTS ...............................22
        1.      Class 1 – Other Priority Claims ...........................................22
                (a)     *Classification*: Class 1 consists of the Other Priority Claims.
                        .............................................................................22
                (b)     *Treatment* ..............................................................22
                (c)     *Voting* ...................................................................23
        2.      Class 2 – Other Secured Claims ............................................23
                (a)     *Classification* .........................................................23
                (b)     *Treatment* ..............................................................23
                (c)     *Voting* ...................................................................23
        3.      Class 3 – Second Lien Term Loan Claims ................................23
                (a)     *Classification* .........................................................23
                (b)     *Treatment* ..............................................................23
                (c)     *Voting* ...................................................................23
        4.      Class 4 – General Unsecured Claims ......................................24
                (a)     *Classification* .........................................................24
                (b)     *Treatment* ..............................................................24
                (c)     *Voting* ...................................................................24
        5.      Class 5 – Intercompany Claims ............................................24
                (a)     *Classification* .........................................................24
                (b)     *Treatment* ..............................................................24
                (c)     *Voting* ...................................................................24
        6.      Class 6 – Intercompany Interests ..........................................24
                (a)     *Classification* .........................................................24
                (b)     *Treatment* ..............................................................24

|  |  | (c) | *Voting* | 24 |
| 7. | | | Class 7 – Existing LBD Interests | 24 |
|  |  | (a) | *Classification* | 24 |
|  |  | (b) | *Treatment* | 25 |
|  |  | (c) | *Voting* | 25 |
| 8. | | | Special Provisions Governing Unimpaired Claims | 25 |
| 9. | | | Elimination of Vacant Classes | 26 |

E. ACCEPTANCE OR REJECTION OF THE PLAN ........................................ 26
    1. Presumed Acceptance of Plan ............................................................ 26
    2. Presumed Rejection of Plan ............................................................... 26
    3. Voting Class ....................................................................................... 26
    4. Acceptance by Impaired Class of Claims ........................................... 26
    5. Voting Class; Presumed Acceptance by Non-Voting Classes ............ 26
    6. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
       Bankruptcy Code ............................................................................... 27
    7. Votes Solicited in Good Faith ............................................................ 27

F. MEANS FOR IMPLEMENTATION OF THE PLAN ................................ 27
    1. Transactions Effective as of the Effective Date .................................. 27
    2. Plan Administrator ............................................................................. 27
    3. The Plan Administration Process ....................................................... 29
    4. Release Consideration ........................................................................ 30
    5. Merger of Debtors; Closing Cases of Debtor Affiliates ..................... 31
    6. Corporate Action ............................................................................... 31
    7. Exemption from Certain Transfer Taxes ............................................ 31
    8. Effectuating Documents; Further Transactions .................................. 32
    9. Directors, Managers, and Officers of the Debtors .............................. 32
    10. Insurance Policies .............................................................................. 32
    11. Preservation of Rights of Action ....................................................... 33
    12. Closing of the Lucky Brand Case ...................................................... 33

G. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
   LEASES ..................................................................................................... 33
    1. Assumption and Assignment of Executory Contracts and Unexpired
       Leases ................................................................................................. 33
    2. Preexisting Obligations to the Debtors Under Executory Contracts
       and Unexpired Leases ........................................................................ 33
    3. Rejection Damages Claims ................................................................. 34
    4. Nonoccurrence of Effective Date ....................................................... 34

H. PROVISIONS GOVERNING DISTRIBUTIONS ................................... 34
    1. Timing and Calculation of Amounts to Be Distributed; Entitlement
       to Distributions; Funding of Disbursements ...................................... 34
       (a) Timing and Calculation of Amounts to Be Distributed ............. 34
       (b) Entitlement to Distributions ..................................................... 34
       (c) Funding of Disbursements ........................................................ 35

US-DOCS\117184478.18

|  | 2. | Disbursing Agent ................................................................35 |
|  | 3. | Distributions on Account of Claims Allowed After the Effective Date ..................................................................................35 |
|  |  | (a) | Payments and Distributions on Disputed Claims...........................35 |
|  |  | (b) | Special Rules for Distributions to Holders of Disputed Claims .................................................................................36 |
|  | 4. | Delivery of Distributions and Undeliverable or Unclaimed Distributions...................................................................36 |
|  |  | (a) | Delivery of Distributions in General.................................36 |
|  |  | (b) | Undeliverable Distributions and Unclaimed Property...............36 |
|  | 5. | Compliance with Tax Requirements/Allocations ...............37 |
|  | 6. | Surrender of Cancelled Instruments or Securities .............37 |
|  | 7. | Claims Paid or Payable by Third Parties ..........................37 |
|  |  | (a) | Claims Paid by Third Parties ....................................37 |
|  |  | (b) | Claims Payable to Third Parties .................................38 |
|  |  | (c) | Applicability of Insurance Policies...............................38 |
|  | 8. | Allocation of Plan Distributions between Principal and Interest.............38 |
|  | 9. | Objection Deadline ..........................................................38 |
|  | 10. | De Minimis Distributions ................................................39 |

| I. | | PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ................................................................39 |
|  | 1. | Allowance and Disallowance of Claims ............................39 |
|  | 2. | Prosecution of Objections to Claims.................................39 |
|  | 3. | Estimation of Claims........................................................39 |
|  | 4. | Distributions After Allowance .........................................40 |

| J. | | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................40 |
|  | 1. | Conditions Precedent to Confirmation..............................40 |
|  | 2. | Conditions Precedent to the Effective Date ......................40 |
|  | 3. | Waiver of Conditions.......................................................41 |
|  | 4. | Effect of Non-Occurrence of Conditions to Confirmation or Consummation ................................................................42 |

| K. | | RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS ................................................................42 |
|  | 1. | General ................................................................42 |
|  | 2. | Debtor Release ................................................................42 |
|  | 3. | Release by Holders of Claims and Interests .....................43 |
|  | 4. | Exculpation ................................................................44 |
|  | 5. | Permanent Injunction ......................................................44 |
|  | 6. | Setoffs ................................................................45 |
|  | 7. | Release of Liens ..............................................................45 |
|  | 8. | Preservation of All Causes of Action Not Expressly Settled or Released ................................................................45 |
|  | 9. | Post-Effective Date Personnel .........................................46 |

US-DOCS\117184478.18

　　　　10.　　Integral Part of Plan ..................................................................46

L.　　RETENTION OF JURISDICTION ...............................................46

M.　　MISCELLANEOUS PROVISIONS ...............................................48
　　　　1.　　Reservation of Rights ......................................................48
　　　　2.　　Payment of Statutory Fees .............................................48
　　　　3.　　Statutory Committee .......................................................48
　　　　4.　　Modification of Plan .......................................................49
　　　　5.　　Revocation or Withdrawal of Plan .................................49
　　　　6.　　Successors and Assigns ...................................................49
　　　　7.　　Reservation of Rights ......................................................50
　　　　8.　　Further Assurances ..........................................................50
　　　　9.　　Severability .....................................................................50
　　　　10.　　Service of Documents .....................................................50
　　　　11.　　Governing Law ...............................................................52
　　　　12.　　Tax Reporting and Compliance ......................................52
　　　　13.　　Schedules ........................................................................52
　　　　14.　　Conflicts ..........................................................................52
　　　　15.　　No Strict Construction ....................................................52
　　　　16.　　Entire Agreement ............................................................53
　　　　17.　　2002 Notice Parties ........................................................53

VI. CERTAIN RISK FACTORS AFFECTING THE DEBTORS ...............................53

A.　　CERTAIN BANKRUPTCY LAW CONSIDERATIONS .............53
　　　　1.　　General ............................................................................53
　　　　2.　　Parties in Interest May Object to Debtors' Classification of Claims
　　　　　　　and Interests ....................................................................53
　　　　3.　　The Debtors May Fail to Satisfy the Voting Requirements .....................53
　　　　4.　　The Debtors May Not Be Able to Secure Confirmation of the Plan .........54
　　　　5.　　Risk of Non-Occurrence of the Effective Date .............54
　　　　6.　　Conversion to Chapter 7 Cases or Dismissal of Chapter 11 Cases ...........54
　　　　7.　　Risk of Re-solicitation of the Plan ................................55
　　　　8.　　Releases, Injunctions and Exculpation Provisions May Not be
　　　　　　　Approved ..........................................................................55
　　　　9.　　Risk Related to the DIP Orders ......................................55

B.　　ADDITIONAL FACTORS TO BE CONSIDERED ......................55
　　　　1.　　Debtors Could Withdraw Plan ........................................55
　　　　2.　　The Debtors Have No Duty to Update ............................55
　　　　3.　　No Representations Outside This Disclosure Statement Are
　　　　　　　Authorized ........................................................................56
　　　　4.　　No Legal or Tax Advice Is Provided to You by This Disclosure
　　　　　　　Statement ..........................................................................56
　　　　5.　　No Admission Made .........................................................56
　　　　6.　　Failure to Identify Litigation Claims or Projected Objections ................56

7. No Waiver of Right to Object or Right to Recover Transfers and Assets ............................................................................................. 56

8. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ....................................................................... 56

9. Certain Material U.S. Federal Income Tax Consequences ..................... 57

VII. CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................................................................................................... 57

A. IN GENERAL .................................................................................................. 57

B. CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE U.S. HOLDERS OF SECOND LIEN TERM LOAN CLAIMS ........................................................................................... 59

C. BACKUP WITHHOLDING AND INFORMATION REPORTING ................... 59

VIII. CONFIRMATION OF THE PLAN ......................................................................... 60

A. CONFIRMATION HEARING ............................................................................ 60

B. OBJECTIONS ................................................................................................... 60

C. REQUIREMENTS FOR CONFIRMATION OF THE PLAN ............................. 62

1. Requirements of Section 1129(a) of the Bankruptcy Code ..................... 62
    (a) General Requirements ............................................................... 62
    (b) Best Interests Test ..................................................................... 63
    (c) Feasibility Analysis ................................................................... 64

2. Requirements of Section 1129(b) of the Bankruptcy Code ..................... 65
    (a) No Unfair Discrimination .......................................................... 65
    (b) Fair and Equitable Test ............................................................. 65
    (c) Holders of Interests ................................................................... 66
    (d) Application to the Plan .............................................................. 66

3. Alternative to Confirmation and Consummation of the Plan ................... 66
    (a) Alternative Plan ........................................................................ 66
    (b) Dismissal or Liquidation Under Chapter 7 ............................... 66

IX. CONCLUSION ......................................................................................................... 68

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "*DISCLOSURE STATEMENT*") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING VOTES ON THE *JOINT PLAN OF LIQUIDATION FOR LUCKY BRAND DUNGAREES, LLC AND ITS AFFILIATED DEBTORS*, DATED AUGUST 28, 2020 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "*PLAN*"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[2]  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

**ALL HOLDERS OF CLAIMS ELIGIBLE TO VOTE ON THE PLAN ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL SUCH HOLDERS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE VI OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN AND DISCLOSURE STATEMENT ARE ALSO BEING PROVIDED FOR INFORMATION PURPOSES TO THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ELIGIBLE TO VOTE ON THE PLAN.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICTS BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN GOVERN.**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

AS TO CONTESTED MATTERS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE

---

[2]  Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined have the same meanings ascribed to such terms in the Plan.

CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT ALSO WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THE CHAPTER 11 CASES. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM OR INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

US-DOCS\117184478.18

# I.
# INTRODUCTION

On July 3, 2020 (the "***Petition Date***"), Lucky Brand Dungarees, LLC and certain of its affiliates (collectively "***Lucky***", the "***Company***" or the "***Debtors***") commenced with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") voluntary cases pursuant to chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  The Debtors' chapter 11 cases (the "***Chapter 11 Cases***") are being administered under the caption *In re Lucky Brand Dungarees, LLC*, Case No. 20-11768 (CSS).

On [ ● ], 2020, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical Holder of an Allowed Claim to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' pre-sale businesses and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan, (iv) the rights of Holders of Claims and Interests under the Plan, and (v) other information necessary to enable each Holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan.  Only Holders of Claims in Class 3 are entitled to vote on the Plan, and Holders of Interests are not entitled to vote on the Plan (*see* discussion at Article V of this Disclosure Statement).

Pursuant to section 1125 of the Bankruptcy Code, the Debtors submit this Disclosure Statement to all Holders of Claims against the Debtors entitled to vote on the Plan to provide information in connection with the solicitation of votes to accept or reject the Plan.  This Disclosure Statement is also available to all Holders of Claims against and Interests in the Debtors not eligible to vote on the Plan for informational purposes, including to detail the impact the Plan will have on such Holders' Claims and Interests.  This Disclosure Statement is organized as follows:

- Article I includes certain general information.
- Article II provides an overview of the Debtors' pre-sale operations.
- Article III sets forth key events leading to the Chapter 11 Cases.
- Article IV discusses the Chapter 11 Cases.
- Article V contains a summary of the Plan.
- Article VI describes certain factors affecting the Debtors.
- Article VII discusses certain U.S. federal income tax consequences of the Plan.
- Article VIII addresses confirmation of the Plan.
- Article IX concludes this Disclosure Statement and recommends that eligible creditors vote to accept the Plan.

US-DOCS\117184478.18

## A.     VOTING PROCEDURES

As set forth in more detail in Article V.B of this Disclosure Statement, certain Holders of Claims are entitled to vote to accept or reject the Plan. For each Holder of a Claim entitled to vote on the Plan, the Debtors have enclosed, along with a copy of this Disclosure Statement, among other things, a Ballot and voting instructions regarding how to properly complete the Ballot and submit a vote with respect to the Plan. Holders of more than one Claim will receive an individual Ballot for each Claim. The individual Ballots must be used to vote each individual Claim. For detailed voting instructions, please refer to the specific voting instructions and the Ballot enclosed with this Disclosure Statement.

All completed Ballots must be actually received by Epiq Corporate Restructuring, LLC ("*Epiq*" or the "*Balloting Agent*") at the following address no later than **4:00 p.m. (prevailing Eastern Time) on November 3, 2020** (the "*Voting Deadline*").

Via First Class Mail:

> Lucky Brand Dungarees, LLC, Claims Processing Center
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4420
> Beaverton, OR 97076-4420

Via Hand Delivery or Overnight Mail:

> Lucky Brand Dungarees, LLC, Claims Processing Center
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Blvd.
> Beaverton, OR 97005

If you are Holder of a Claim that is entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact Epiq by email at LuckyBrand@epiqglobal.com.

The Debtors will also be accepting Ballots via electronic, online transmission through an electronic balloting platform available on Epiq's website at https://dm.epiq11.com/LuckyBrand. Holders of Claims and Interests may cast an electronic Ballot and electronically sign and submit such Ballot via the platform. Instructions for casting an electronic Ballot are available on Epiq's website.

| **THE BALLOTING AGENT WILL NOT COUNT**<br>**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE.** |
|---|

US-DOCS\117184478.18

## B. DISCLOSURE STATEMENT EXHIBITS

The following exhibits are annexed to this Disclosure Statement:

- EXHIBIT A – The Plan (with exhibits)
- EXHIBIT B – Debtors' Prepetition Organizational Structure
- EXHIBIT C – Wind Down Budget

## C. THE DEBTORS' PROFESSIONALS

The Debtors have retained the following professionals pursuant to separate orders of the Bankruptcy Court: (i) Latham & Watkins LLP ("*Latham*") and Young Conaway Stargatt & Taylor LLP ("*YCST*"), as their legal advisors: (ii) Houlihan Lokey Capital, Inc. ("*Houlihan*") as their investment bankers; (iii) Berkeley Research Group ("*BRG*") as their financial advisors; (iv) Epiq, as claims agent and administrative advisor. The contact information for these professionals is set forth below:

| | |
|---|---|
| **Latham & Watkins LLP** | **Young Conaway Stargatt & Taylor, LLP** |
| 885 Third Avenue | Rodney Square |
| New York, NY 10022 | 1000 North King Street |
| Attn: George A. Davis | Wilmington, DE 19801 |
| Brian S. Rosen | Attn: Michael R. Nestor |
| Jonathan J. Weichselbaum | Kara Hammond Coyle |
| Tel: (212) 906-1200 | Joseph M. Mulvihill |
| | Tel: (302) 571-6600 |
| and | |
| 355 South Grand Avenue | **Berkeley Research Group** |
| Suite 100 | 99 High St |
| Los Angeles, CA 90071 | Suite 2700 |
| Attn: Ted A. Dillman | Boston, MA 02110 |
| Christina M. Craige | Attn: Mark Renzi |
| Tel: (213) 485-1234 | Tel: (617) 925-4018 |
| | |
| **Houlihan Lokey Capital, Inc.** | **Epiq Corporate Restructuring, LLC** |
| 10250 Constellation Blvd., 5th Floor | 777 Third Avenue, 12th Floor |
| Los Angeles, CA 90067 | New York, NY 10017 |
| Attn: Eric Winthrop | Attn: Kathryn Tran |
| Tel: (310) 553-8871 | Tel: (714) 394-6998 |

## D. IMPORTANT DATES

Please take note of the following important dates and deadlines:

| Deadline to File and serve any objection or response to the Plan (the "***Plan Objection Deadline***") | November 3, 2020 at 4:00 p.m. (prevailing Eastern Time) |
|---|---|
| Deadline for completed Ballots to be received by the Balloting Agent (the "***Voting Deadline***") | November 3, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Scheduled date and time for the commencement of the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***") | [ ● ], 2020 at [ ● ] (prevailing Eastern Time) |

## E.     BRIEF OVERVIEW OF THE PLAN[3]

On August 14, 2020, the Debtors consummated a sale of substantially all of their assets, pursuant to an Asset Purchase Agreement and Sale Transaction approved by the Bankruptcy Court on August 12, 2020.  The credit bid approved as part of the Sale Transaction extinguished the Debtors' debtor-in-possession financing, as well as a portion of their Second Lien Term Loan Claims.  Certain proceeds from the Sale Transaction were used at the closing to pay off the Debtors' First Lien Lenders.  The remaining Net Sale Proceeds of the Sale Transaction were used to fund certain accounts established and maintained by the Debtors and Young Conaway Stargatt & Taylor, as well as to fund the payment to the Second Lien Lenders, all in accordance with and to the extent required under the Sale Order.  The Plan described in this Disclosure Statement provides for the distribution of Net Sale Proceeds remaining as of the Effective Date of the Plan.

On the Effective Date of the Plan, the Debtors shall fund from their Cash on hand, including any remaining Net Sale Proceeds (i) the initial distribution to Class 3 provided under the Plan, and, to the extent not already funded, (ii) the Wind Down Reserve in accordance with the Wind Down Budget, attached as **Exhibit C** hereto, and the Plan Administration Agreement, a form of which will be Filed with the Plan Supplement.  The Wind Down Reserve shall vest in the Debtors and their Estates pursuant to Article V.C of the Plan.

The Person designated in the Plan Supplement shall serve as Plan Administrator and shall, among other things, facilitate Distributions under the Plan until the Chapter 11 Cases of all of the Debtors have been fully administered.

Article V of this Disclosure Statement provides a more detailed description of the Plan.

## F.     SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a summary of designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is

---

[3]  This summary is qualified in its entirety by reference to the Plan. Statements as to the rationale underlying the treatment of Claims and Interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims, defenses, or causes of action in the event that the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

US-DOCS\117184478.18

classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim is also classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor. Therefore, the classifications set forth in Article III.B of the Plan apply separately with respect to each Plan proposed by each Debtor. This joint Plan and the classifications set forth herein shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a substantive consolidation of any of the Debtors, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. Notwithstanding the joint nature of the Plan, nothing herein shall permit or grant a party in interest in the Chapter 11 Case of one Debtor with standing, or the right to vote to accept or reject the Plan, in the Chapter 11 Case of another Debtor. If there are no Claims or Interests in a particular Class for a particular Debtor, then such Class of Claims or Interests shall not exist for all purposes of the Plan for that Debtor.

If the Bankruptcy Court does not confirm the Plan with respect to one or more of the Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

<u>Summary of Classification and Treatment of Classified Claims and Interests</u>

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2. | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3. | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 4. | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5. | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6. | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

US-DOCS\117184478.18

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 7. | Existing LBD Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

Article V.B of this Disclosure Statement provides a more detailed description of the treatment of Claims and Interests under the Plan.

## G. CONFIRMATION UNDER SECTION 1129(B)

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. In addition, with respect to the Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and reasonable" with respect to each rejecting class. A more detailed description of the requirements for confirmation of a nonconsensual plan is set forth in Article VIII of this Disclosure Statement.

## H. CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **[ ● ], 2020 at [ ● ] (prevailing Eastern Time)** before the Honorable Christopher S. Sontchi at the United States Bankruptcy Court for the District of Delaware, 824 N Market Street, Wilmington, DE 19801 (or via telephonic or other electronic means, as the Bankruptcy Court may direct).

Objections and responses to confirmation of the Plan, if any, must be served and Filed so as to be received on or before the Plan Objection Deadline on **November 3, 2020 at 4:00 p.m. (prevailing Eastern Time)**, in the manner described in the order approving this Disclosure Statement (the "***Disclosure Statement Order***") and Article VIII.B of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further Notice except for the filing a Notice of the adjournment date with the Bankruptcy Court.

US-DOCS\117184478.18

# II.
# OVERVIEW OF THE DEBTORS' PREPETITION OPERATIONS

## A.    OVERVIEW OF THE DEBTORS' PRE-SALE BUSINESSES

Founded in Los Angeles, California in 1990, Lucky Brand was, prior to the Sale Transaction, an apparel lifestyle brand that designed, marketed, sold, distributed, and licensed a collection of contemporary premium fashion apparel under the "Lucky Brand" name.  The Company's products, designed for women, men, and children, included denim jeans, pants, woven and knit tops, outerwear, and accessories.  The Company provided a diversified and balanced assortment of products across genders and age groups with 47% of sales in apparel, 40% in denim, and 13% in accessories and other products.  Lucky Brand was globally recognized for innovative, trendsetting denim jeans and apparel.  As of May 2020, the Company operated 112 specialty retail stores and 98 outlet stores in North America.  The Debtors' store locations were all leased.  The annual cost of these leases was approximately $66 million for fiscal year 2019.

Lucky Brand's business was broken down into three segments: (i) its direct to consumer business, (ii) its wholesale business, and (iii) its licensing business.

### 1.    *Direct to Consumer Business*

Lucky Brand sold its products directly to consumers through Company-owned retail stores and through the Company's e-commerce site, www.luckybrand.com.  Lucky Brand's Company-owned stores comprised both full-price retail stores and discount outlet stores.  Lucky Brand maintained stores in 43 states across the United States.  For the fiscal year ended December 31, 2019, Lucky Brand's e-commerce site generated approximately 12% of all sales.

### 2.    *Wholesale Business*

Lucky Brand sold its products to a network of department stores, selected specialty stores, outlet stores and boutiques.  This network included Macy's, Dillard's Costco Wholesale, Nordstrom, TJ Maxx, and e-commerce retailers such as Amazon.com.  Lucky Brand's wholesale business made up approximately 46% of its annual sales for fiscal year 2019.

### 3.    *Licensing Business*

In addition to its direct to consumer and wholesale businesses, Lucky Brand had a licensing business whereby the Company selectively provided licenses to third parties to use the Company's various trademarks in connection with the manufacture and sale of designated products in specified geographical areas for specified periods.  The Company's licensing business generated approximately $14 million in fiscal year 2019.

## B.    PREPETITION ORGANIZATIONAL AND CAPITAL STRUCTURE

As set forth on the organizational chart attached hereto as **Exhibit B**, prior to the Sale Transaction, LBD Parent Holdings, LLC ("***Lucky Parent***") was Lucky Brand Dungarees, LLC's ("***Lucky Brand***") ultimate parent.  The equity interests of Lucky Parent were primarily

owned by Clover Holdings II, LLC ("**Clover Holdings**") and Carlos Alberini. An affiliate of Lantern Capital Partners ("**LCP**"), an affiliate of Hilco Merchant Resources LLC ("**Hilco**"), and Clover Holdings held warrants to purchase equity of Lucky Parent representing approximately 39.24% of the outstanding equity of Lucky Parent for a nominal price. Lucky Parent owned, directly or indirectly, each of the other Debtors and non-Debtor Lucky Canada (as defined below).

The substantial majority of the operations of the Debtors occurred at Lucky Brand, which undertook corporate, wholesale, and operations functions, and Debtor Lucky Brand Dungarees Stores, LLC, which undertook retail operations in the United States. In 2019, the Debtors operated nine stores in Canada through Lucky Brand Dungarees Canada, Inc. ("**Lucky Canada**"). In the spring of 2020, the Company made the decision to halt operations in Canada and permanently close all of its Canadian stores. On or around the Petition Date, Lucky Canada commenced liquidation proceedings under the Bankruptcy and Insolvency Act (Canada), R.S.C. 1985, c. B-3.[4] The Debtors' Puerto Rican retail operations were undertaken by Debtor Lucky PR, LLC.

The following table summarizing the Debtors' outstanding funded debt obligations as of the Petition Date:

| Funded Debt | Maturity | Approximate Principal Amount Outstanding |
|---|---|---|
| First Lien Term Loan Facility | November 2024 | $49.27 million |
| First Lien Revolving Facility | November 2024 | $61.31 million (including Letters of Credit in the amount of $9.69 million) |
| Second Lien Term A Loan | February 2025 | $54.58 million |
| Second Lien Term B Loan | February 2025 | $16.81 million |
| **Total Funded Debt** | | $181.97 million |

1. *Secured Debt – First Lien Credit Agreement and Second Lien Credit Agreements*

   (a) First Lien Credit Agreement

Prior to the Sale Transaction, certain of the Debtors, Wells Fargo Bank, National Association ("**Wells Fargo**") as administrative agent, term loan agent, and collateral agent (the "**First Lien Agent**") and Gordon Brothers Finance Company, LLC ("**GBFC**") were parties to the First Lien Credit Agreement (as defined in the DIP Orders), under which Wells Fargo and GBFC (the "**First Lien Lenders**") agreed to provide a $50 million term loan facility (the "**First Lien Term Loan Facility**"), and Wells Fargo agreed to provide a $150 million revolving credit facility, subject to certain sublimits (the "**First Lien Revolving Facility**"). Until closing of the Sale Transaction (discussed further below), the First Lien Term Loan Facility and the First Lien Revolving Facility

---

[4] The Debtors expected that all proceeds from the liquidation of Lucky Canada would be used to pay Lucky Canada's creditors and the Debtors do not anticipate that there would be recoveries in excess of Lucky Canada's obligations. In the event that there are recoveries in excess of Lucky Canada's debts, those recoveries would flow to the Debtors and, upon consummation of the Plan, the Plan Administration Trust.

were secured by a first-priority interest in the Senior Collateral[5], which comprises substantially all of the Debtors' assets.

Pursuant to the DIP Orders and the Sale Order, all outstanding obligations under the First Lien Term Loan Facility and First Lien Revolving Facility were repaid and extinguished from the proceeds of the Sale Transaction through the Prior First Lien Payment.

(b)      Second Lien Term Loan A Credit Agreement

Certain Debtors, Wilmington Trust, National Association, as administrative agent and collateral agent (the "**Second Lien Term Loan A Agent**") and Lucky Holdings JV, LLC (the "**Second Lien Term Loan A Lender**") are parties to that certain Second Lien Term Loan A Credit Agreement (as defined in the DIP Orders), under which the Second Lien Term Loan A Lender provided a term loan in an aggregate principal amount of $50 million (the "**Second Lien Term A Loan**") to the Borrower. The Second Lien Term Loan A Credit Agreement is secured by what was, on the Petition Date, a second-priority security interest in the Senior Collateral. As a result of the Prior First Lien Payment and the satisfaction of the DIP Loans, the Second Lien Term Loan A Credit Agreement is secured by a first-priority security interest (subject to any Prior Permitted Liens (as defined in the DIP Orders)). The obligations under the Second Lien Term Loan A Credit Agreement have been unconditionally guaranteed by Debtor LBD Intermediate Holdings, LLC ("**Holdings**") and the other direct and indirect domestic subsidiaries of Lucky Brand (collectively, the "**Guarantors**").

Pursuant to the Sale Transaction, $30,581,039.76 of the Second Lien Term A Loan was credit bid as part of the All Assets Bid (defined below). Pursuant to the Sale Order, the Debtors effectuated the Prior Second Lien Payment from the proceeds of the Sale Transaction to repay $3,822,629.96 of the Second Lien Term A Loan.

(c)      Second Lien Term Loan B Credit Agreement

The Borrower, Holdings, and Clover Holdings as administrative agent and collateral agent (in such capacity, the "**Second Lien Term Loan B Agent**" and together with the Second Lien Term Loan A Agent, the "**Second Lien Agents**") and as lender (in such capacity, the "**Second Lien Term Loan B Lender**" and collectively with the Second Lien Term Loan A Lender, the "**Second Lien Lenders**") are parties to that certain Second Lien Credit Agreement, dated as of November 12, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Term Loan B Credit Agreement**" and, collectively with the Second Lien Term Loan A Credit Agreement, the "**Second Lien Credit Agreements**"). The Second Lien Term Loan B Lender provided a term loan in an aggregate principal amount of $15.4 million (the "**Second Lien Term B Loan**" and together with the Second Lien Term A Loan, the "**Second Lien Term Loans**") to the Borrower. The Second Lien Term Loan B Credit Agreement is secured by what was, on the Petition Date, a second-priority security interest in the Senior Collateral. As a result of the Prior First Lien Payment and the satisfaction of the DIP Loans,

---

[5] "**Senior Collateral**" means all the "Collateral" (or equivalent term) as defined in any Collateral Document (as defined in the First Lien Credit Agreement) and shall include the Mortgaged Properties (as defined in the First Lien Credit Agreement), if any.

the Second Lien Term Loan A Credit Agreement is secured by a first-priority security interest (subject to any Prior Permitted Liens). The obligations under the Second Lien Term Loan B Credit Agreement have been unconditionally guaranteed by the Guarantors.

Pursuant to the Sale Transaction, $9,418,960.24 of the Second Lien Term B Loan was credit bid as part of the All Assets Bid. Pursuant to the Sale Order, the Debtors effectuated the Prior Second Lien Payment from the proceeds of the Sale Transaction to repay $1,177,370.04 of the Second Lien Term B Loan.

2. *The Second Lien Pari Passu Intercreditor Agreement*

The respective rights of the Second Lien Lenders as between themselves with respect to their respective second-priority security interests in the collateral are governed by that certain Second Lien Pari Passu Intercreditor Agreement, dated as of November 12, 2019, by and among the Second Lien Term Loan A Agent and the Second Lien Term Loan B Agent and as acknowledged and agreed to by Holdings, the Borrower and the other Guarantors (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Intercreditor Agreement***"). The Intercreditor Agreement governs, among other things, the priority of distribution of the Senior Collateral with respect to the Second Lien Lenders' respective pari passu security interests and the respective rights of the Second Lien Term Loan A Lender and the Second Lien Term Loan B Lender in connection with certain bankruptcy matters. In accordance with the Intercreditor Agreement: (i) the Second Lien Lenders are secured on a pari passu basis amongst each other with respect to their respective security interests in the Senior Collateral, and (ii) the Second Lien Term Loan A Agent is entitled to exercise remedies with respect to the Senior Collateral before the Second Lien Term Loan B Agent is so entitled.

3. *Preferred Units and Common Units*

Prior to the Petition Date, Lucky Parent had issued 130,123,956 Preferred Units (the "***Preferred Units***") to three holders. As of the Petition Date, Clover Holdings held approximately 89.9%, Carlos Alberini held approximately 9.8%, and the Krevlin 2005 Gift Trust held approximately 0.3% of the Preferred Units.

As of the Petition Date, Lucky Parent had also issued approximately 27,859,510 Class A Common Units (the "***Class A Common Units***") to various holders. As of the Petition Date, Clover Holdings held approximately 75% and Carlos Alberini held approximately 13.5% of the Class A Common Units, with the remainder held by various other holders. The Preferred Units were entitled to receive return of capital prior to the Class A Common Units. Prior to the Petition Date, Lucky Parent had also issued Class C-1 Common Units, Class C-2 Common Units, and Class E Common Units to certain employees of its subsidiaries pursuant to equity incentive plans.

4. *Unsecured Debt*

In addition to their funded debt, the Debtors also owe significant amounts on an unsecured basis to vendors, landlords, service providers, and others. As of the Petition Date, the Debtors estimated that approximately $79 million of merchandise trade debt was due and outstanding.

# III.
## KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

## A.    <u>OVERVIEW</u>

Leading up to the Petition Date, notwithstanding their core operating strengths, the Debtors were burdened by their substantial debt load and faced many of the same pressures affecting U.S. retailers more generally, especially in light of the COVID-19 pandemic. As of the Petition Date, the Debtors' capital structure included approximately $181.97 million in funded debt. Prior to the COVID-19 pandemic, the Debtors had been focused on operational and strategic alternatives aimed at restructuring its retail operations and store profile and extending the Company's maturity runway while allowing it to service interest payments on its funded debt.

Despite the Debtors' best efforts and support of its economic stakeholders, the Debtors' restructuring efforts were derailed by a combination of the economic impact of the global COVID-19 pandemic, which resulted in extended closures of its retail stores, and limited liquidity, which diminished access to new inventory from its vendors. As a result, the Debtors were forced to explore alternatives to maximize the value of their business and restructure their debt.

Against this backdrop, the Debtors and their advisors worked tirelessly to solicit and develop various strategic alternatives throughout the first half of 2020 to maximize stakeholder value, including commencing a sale-marketing process involving more than six dozen strategic and financial investors, and running a concurrent financing process. While several parties expressed interest in acquiring the Debtors as a going concern, the aforementioned difficulties compounded the Debtors' limited liquidity and substantial lease and trade related obligations, and negatively impacted the Debtors' ability to effectuate an out-of-court transaction that would address their liquidity challenges and position the Debtors for long-term success.

After launching an initial targeted prepetition marketing process, on July 3, 2020, the Debtors entered into a stalking horse asset purchase agreement (the "***Stalking Horse Purchase Agreement***") with SPARC Group LLC ("***SPARC***") for the sale of substantially all of the Debtors' assets (the "***All Assets Bid***"), and pursuant to the Stalking Horse Purchase Agreement, SPARC agreed to designate certain assets to the following parties (or their respective designees), in exchange for payment of a portion of the purchase price thereunder: (i) Authentic Brands Group, LLC ("***ABG***"), (ii) each of the DIP Lenders (as defined below), and (iii) each of the Second Lien Lenders.

ABG is a brand development, marketing, and entertainment company and SPARC is a leading apparel company operating under the Aeropostale and Nautica brands owned by ABG and Simon Property Group, which was one of the Debtors' key landlords.[6] As a result of the active engagement by both ABG and SPARC in the Company's 2019 refinancing activities and marketing process and these parties' considerable retail market and industry knowledge, these

---

[6]    LGP is a minority equityholder in ABG.

parties, working with the Second Lien Lenders, were in a position to move quickly to provide a stalking horse bid that would set the baseline for an expedited sale process.

Despite management's best efforts, the significant impact of the COVID-19 crisis and shutdown of the Debtors' stores, when coupled with the Debtors' constrained liquidity, it became apparent that the Debtors were not able to sustain their outstanding debt on a long-term basis and maintain the liquidity necessary to operate their business and maximize long-term enterprise value. On July 3, 2020, the Debtors entered into the Stalking Horse Purchase Agreement and Filed their bankruptcy petitions.

## IV.
## THE CHAPTER 11 CASES

### A.    FIRST DAY PLEADINGS

On the Petition Date, the Debtors Filed various "first-day" motions (collectively, the "***First Day Pleadings***") seeking certain immediate relief from the Bankruptcy Court designed to allow the Debtors to continue to operate in chapter 11 and avoid irreparable harm due to the commencement of the Chapter 11 Cases. The Bankruptcy Court granted substantially all of the relief requested in the First Day Pleadings and entered various orders authorizing the Debtors to, among other things:

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 221];
- Continue paying employee wages and benefits [Docket No. 194];
- Continue customer programs [Docket No. 90];
- Pay prepetition claims of shippers, warehousemen, and miscellaneous lien claimants [Docket No. 219];
- Pay certain critical vendors and obligations with respect to prepetition orders of goods to be delivered postpetition [Docket No. 220];
- Pay certain prepetition taxes and assessments [Docket No. 196];
- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 195]; and
- Continue insurance programs and modify the automatic stay as to workers' compensation claims [Docket No. 197].

In addition to the First Day Pleadings, on the Petition Date, the Debtors also Filed motions seeking authority to, among other things, (1) reject certain executory contracts and unexpired leases and (2) extend the deadline to File their schedules and statements of financial information, which motions were later granted.

### B.    DEBTOR-IN-POSSESSION FINANCING

As part of their stalking horse proposal, the Second Lien Lenders proposed, as an integrated package deal with the Stalking Horse Purchase Agreement, a term sheet for debtor-in-

possession financing (the "***DIP Financing***").  The term sheet provided for a $15.6 million super-priority junior secured debtor-in-possession term loan facility, which allowed for the use of cash collateral pursuant to an approved budget, established certain fees and expenses, and set the interest rate equivalent to that of the Second Lien Credit Agreements.  The DIP Financing was conditioned on the use of the First Lien Lenders' cash collateral.  The Debtors' lenders' support was conditioned on an accelerated sale process to minimize the administrative expense of the Chapter 11 Cases and to ensure the transition of the business to SPARC, which would enable the Debtors' business to continue as a going concern for the benefit of all stakeholders.

On the Petition Date, the Debtors Filed a motion (the "***DIP Motion***") to, among other things, obtain approval of the DIP Financing, use of cash collateral, and provision of adequate protection to the Second Lien Lenders in connection with a debtor-in-possession facility comprised of a junior secured term loan credit facility in the aggregate principal amount of $15,600,000 (the "***Junior DIP Facility***"), by and among Debtor Lucky Brand, as borrower, the guarantors party thereto, LCP or its designee in its capacity as administrative agent and collateral agent (in such capacity, the "***DIP Lender Representative***"), LCP, ReStore Capital, LLC ("***ReStore***") or one of its affiliates, and Clover Holdings or one of its affiliates.  The Junior DIP Facility also required Debtors to meet certain milestones, which were satisfied in a timely fashion.

Because the DIP Obligations (as defined in the DIP Motion) were credit bid or otherwise satisfied in full in the Sale Transaction, such obligations have been extinguished; however, the Debtors are still bound by the DIP Orders – including the timeline set forth for filing and confirmation of a plan, as extended with consent of the Second Lien Lenders, as a condition of consensual use of cash collateral of the Second Lien Lenders.

## C.     STORE CLOSING MOTION

On the Petition Date, the Debtors Filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Approving (A) Procedures for Store Closing Sales, (B) Customary Bonuses to Non-Insider Employees of Closing Stores, and (C) Assumption of Consulting Agreement, and (II) Granting Related Relief* [Docket No. 12] (the "***GOB Motion***") seeking to implement a key component of their initial restructuring strategy and right-size their operations by closing underperforming or geographically undesirable stores.  The GOB Motion set out streamlined procedures to sell the inventory, furniture, fixtures, and equipment at any store scheduled for closure, in each case free and clear of liens, claims and encumbrances.  In the GOB Motion, the Debtors and their advisors identified 13 stores that required prompt closure.  The Bankruptcy Court approved the GOB Motion on a final basis and the continuation and implementation of the store closing sales of the initial 13 stores on July 28, 2020 [Docket No. 218] (the "***GOB Order***").

## D.     FORMATION OF THE CREDITORS' COMMITTEE

On July 17, 2020, the United States Trustee for the District of Delaware (the "***U.S. Trustee***") appointed the Official Committee of Unsecured Creditors (the "***Committee***") pursuant to section 1102 of the Bankruptcy Code [Docket No. 155 (as amended at Docket No. 157)].  The Committee retained Pachulski Stang Ziehl & Jones LLP as its attorneys and Alvarez & Marsal Holdings, LLC as its financial advisor.  The members of the Committee are Red & Blue International Co., Ltd., Orit Trading Lanka (PVT) LTD, INT, S.A., Busana Apparel Ptd.

Ltd, Ubase International, Inc., Brookfield Properties Retail, Inc., and Hirdaramani International Exports (Pvt) Ltd.

## E.    SALE TRANSACTION

As noted above, the Debtors entered into the Stalking Horse Purchase Agreement on the Petition Date.  Upon the filing of the Chapter 11 Cases the Debtors Filed the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures, and (F) Granting Related Relief, and (II)(A) Approving Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "***Bidding Procedures Motion***") [Docket No. 15].  The Bidding Procedures Motion sought entry of an order approving the Debtors' sale process and related materials (the "***Bidding Procedures Order***") [Docket No. 251] and an order approving the Debtors' entry into the Stalking Horse Purchase Agreement, subject to higher or better bids at an auction, if applicable (the "***Sale Order***") [Docket No. 349].

The All Assets Bid contained in the Stalking Horse Purchase Agreement included cash in the amount of $140,100,000, the Specified Trade Receivables Adjustment (as defined in the Stalking Horse Purchase Agreement), an aggregate credit bid equivalent to approximately $51,500,000, *plus* other consideration.  The Stalking Horse Purchase Agreement preserved the Debtors' business as a going concern, including (i) preserving much or all of the Debtors' current store footprint, (ii) contemplating the employment of many of the Debtors' store and other employees, (iii) continuing to source merchandise from the Debtors' vendor base, (iv) maintaining ongoing relationships with many of the Debtors' other contract counterparties and assuming certain liabilities related thereto, and (v) providing cash consideration sufficient to repay or satisfy all amounts due to the Debtors' First Lien Lenders, and provide certain wind down costs in accordance with an approved budget to facilitate the orderly winding up of the estate and confirmation of a chapter 11 liquidating plan; *provided*, *however*, that the funding of such wind-down costs did not guarantee or otherwise ensure that such funds will prove to be sufficient for the Debtors to fund and confirm a chapter 11 plan.

On July 30, 2020 the Bankruptcy Court entered the Bidding Procedures Order, approving among other things the Bidding Procedures (as defined in the Bidding Procedures Order).  Pursuant to the terms of the Bidding Procedures Order, no Qualified Bids (as defined in the Bidding Procedures Order) were received and thus no Auction (as defined in the Bidding Procedures Order) was held.  On August 14, 2020, the Debtors closed the Sale Transaction for consideration consisting of (i) an aggregate cash amount of $140,100,000, plus the Specified Trade Receivables Adjustment (as defined the in the Stalking Horse Purchase Agreement), (ii) an aggregate credit bid equivalent to approximately $51,500,000, and (iii) the Purchaser's assumption of certain of the Debtors' liabilities.  The Stalking Horse Purchase Agreement also provided for a designation rights period of at least sixty (60) days after closing of the Sale Transaction, during which the Debtors would provide certain transition services pursuant to a Transition Services Agreement and SPARC would have the opportunity to determine whether to designate for

assumption and assignment or for rejection any Executory Contracts and Unexpired Leases not assumed and assigned or rejected at the closing.

On August 14, 2020, the Debtors consummated the Sale Transaction pursuant to the terms and conditions of the Asset Purchase Agreement, including, without limitation, (i) selling the Acquired Assets (as defined in the Asset Purchase Agreement) free and clear of certain claims, liens and encumbrances to the extent set forth in the Asset Purchase Agreement and (ii) assuming and assigning to the Purchaser pursuant to the Asset Purchase Agreement in connection with the Sale Transaction certain Executory Contracts and Unexpired Leases.

Upon consummation of the Sale Transaction, the Net Sale Proceeds of the Sale Transaction were used to fund the (i) Prior First Lien Payment, which extinguished the obligations under the First Lien Term Loan Facility and First Lien Revolving Facility and (ii) Prior Second Lien Payment, which repaid $3,822,629.96 of the Second Lien Term A Loan and $1,177,370.04 of the Second Lien Term B Loan, and placed into accounts established and maintained by the Debtors in accordance with and to the extent required under the Sale Order.

Following the closing of the Sale Transaction, the Debtors moved quickly to seek confirmation of the Plan. The Plan seeks to distribute the proceeds of the going-concern sale and other asset dispositions to creditors in accordance with the priority of their Claims.

## F.    COMMITTEE INVESTIGATION AND SETTLEMENT

Upon its formation, the Committee investigated certain claims against insiders, which were included within the assets to be sold to SPARC pursuant to the Stalking Horse Asset Purchase Agreement, and then immediately released. These claims had previously been investigated by the Company prior to its entry into the Stalking Horse Purchase Agreement.

On May 18, 2020, the board of Lucky Parent (the "***Board***") formed a Special Restructuring Committee (the "***Special Committee***") composed of Lucky Parent's independent director, Alan Fragen (the "***Independent Director***") to evaluate strategic alternatives or transactions that may be available to the Debtors that may present conflicts of interest with the Debtors' debt and equity holders. The Special Committee was vested with sole authority over any financing, sale, restructuring, reorganization, recapitalization, or other similar transaction ("***Strategic Transactions***") in which a conflict may exist between the Debtors or any of their stakeholders, on the one hand, and Lucky Parent's equityholders, on the other hand (the "***Potential Conflicts Matters***"). The Special Committee was also tasked with reviewing certain prepetition financing transactions, as well as the relationship between the Debtors and Lucky Parent's major equity holders and the Debtors' lenders and to evaluate any viable causes of action with respect to such matters. The Debtors' co-counsel, YCST, was engaged to assist the Special Committee in connection with this process. The Special Committee, in its sole discretion, was to (i) determine (in its business judgment and with the advice of counsel) whether any matter arising in connection with, or related to, a Strategic Transaction constitutes a Potential Conflicts Matter, (ii) consider, negotiate, and approve or disapprove of any Potential Conflicts Matter, or (iii) make recommendations to the full Board, that any Potential Conflicts Matter be approved by the Board. The negotiation of the Stalking Horse Purchase Agreement, the All Assets Bid, and DIP Financing on the Company's behalf was led and conducted by the Debtors' Chief Restructuring Officer and

the Debtors' professionals and outside advisors under the oversight of the Independent Director. Entry into the Stalking Horse Purchase Agreement and DIP Financing was approved by the Special Committee and thereafter recommended to the full Board, which subsequently consented to the actions and adopted resolutions to enter into the Stalking Horse Purchase Agreement and DIP Financing.

Although some of the Stalking Horse Parties had prepetition connections to the Debtors, the approval and negotiation of the All Assets Bid and the Stalking Horse Purchase Agreement was within the sole authority of the Special Committee and Independent Director. The negotiation of the Stalking Horse Purchase Agreement, the All Assets Bid, and DIP Financing on the Debtors' behalf was led by the Debtors' Chief Restructuring Officer and outside advisors under the oversight of the Debtors' Independent Director. At all times, the Debtors had separate legal counsel from SPARC and ABG to negotiate the All Assets Bid, the Stalking Horse Purchase Agreement and the potential Sale Transaction, and Houlihan acted as an independent investment bank retained by the Debtors for the purpose of exploring strategic alternatives, marketing the Debtors' businesses and soliciting bids. After fulsome investigation of the transaction, the Committee concluded that there were no claims of value to be pursued by the Debtors' estates.

On August 9, 2020, the Committee, the Debtors, and the Second Lien Lenders entered into an agreement in principle to resolve the Committee's objection to the Sale Transaction (the "***Committee Settlement***"). The Committee Settlement provides for the opportunity for any general unsecured creditor who timely returns an opt-in release to participate in the Release Consideration (as defined in Plan).

## G. SCHEDULES AND BAR DATES

On July 30, 2020, the Debtors Filed their schedules of assets and liabilities and statements of financial affairs [Docket Nos. 254, 255, 256, 257, and 258].

On August 12, 2020, the Bankruptcy Court entered an order [Docket No. 342] (the "***Bar Date Order***") establishing (i) September 28, 2020 at 5:00 p.m. (prevailing Eastern Time) as the Deadline for each Person or entity but not including Governmental Units to File a proof of claim (each, a "***Proof of Claim***") in respect of a prepetition Claim, including, for the avoidance of doubt, Secured Claims, priority Claims, and Claims arising under section 503(b)(9) of the Bankruptcy Code, against any of the Debtors (the "***General Bar Date***"), (ii) December 30, 2020 at 5:00 p.m. (prevailing Eastern Time) as the deadline for Governmental Units to File Proofs of Claim in respect of any prepetition Claims against any of the Debtors (the "***Governmental Bar Date***"), (iii) the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days from the date on which the Debtors provide Notice of an amendment or supplement to the Schedules (as defined in the Bar Date Order) that were Filed on July 30, 2020, as the deadline by which claimants holding Claims affected by such Filing, amendment or supplement must File Proofs of Claim with respect to such Claim (the "***Amended Schedules Bar Date***"), and (iv) the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the effective date of rejection of an executory contract or unexpired lease as the deadline by which claimants asserting Claims resulting from the Debtors' rejection of an executory contract or unexpired lease must File Proofs of Claim for damages arising

from such rejection (the "***Rejection Damages Bar Date***" and, together with the General Bar Date, Governmental Bar Date, and Amended Schedules Bar Date, the "***Bar Dates***").

## V.
## THE PLAN

### A.    INTRODUCTION

This section of this Disclosure Statement summarizes the Plan, a copy of which is annexed as **Exhibit A** hereto. This summary is qualified in its entirety by reference to the provisions of the Plan, which provisions shall control in the event of any discrepancy with the descriptions contained in this Disclosure Statement.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the plan, and contains other provisions necessary to implement the plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

> **THE DEBTORS URGE YOU TO READ THE PLAN IN ITS ENTIRETY**
> **BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

### B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

One of the key concepts under the Bankruptcy Code is that only claims that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below.

In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or under applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damages in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as

disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires, for purposes of treatment and voting, that a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders, or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Plan, the following classes are unimpaired, and therefore, the Holders of such Claims are "conclusively presumed" to have voted to accept the Plan: Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims).

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or equity interests in such class do not receive or retain property under the plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, Class 4 (General Unsecured Claims), Class 5 (Intercompany Claims), Class 6 (Intercompany Interests), and Class 7 (Existing LBD Interests) are deemed to reject the Plan because, under the Plan, members of Classes 4 , 5, 6 and 7 will receive no distribution and retain no property interest on account of their Claims and Interests. Since Classes 4, 5, 6 and 7 are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes. Among these are the requirements that the Plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, Classes 4, 5, 6 and 7.

Class 3 (Second Lien Term Loan Claims) is Impaired under the Plan and the Plan provides that Holders of Allowed Claims in Class 3 will receive a distribution on account of such Claims and, therefore, the Holders with respect thereto are entitled to vote to accept or reject the Plan.

## C.    **UNCLASSIFIED CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    *Administrative Claims*

Except with respect to Administrative Claims that are Statutory Fees and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment for such Holder's Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid in full in Cash from the Wind Down Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable. The Debtors shall pay Administrative Claims against the Debtors solely to the extent such funds are available under the Wind Down Budget.

Except as otherwise provided in the Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Plan Administrator pursuant to the procedures specified in the Confirmation Order and the Notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; *provided*, that the foregoing shall not apply to Holders of Claims under section 503(b)(1)(D) of the Bankruptcy Code, the Bankruptcy Court or U.S. Trustee as the Holders of Administrative Claims, or Holders of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code (filing procedures for the latter of which are set forth in the Claims Bar Date Order). Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors and their respective Estates and property, and such Administrative Claims shall be deemed discharged as of the Effective Date. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.E of the Plan. Nothing in Article II.A of the Plan shall limit, alter, or impair the terms and conditions of the Bar Date Order with respect to the Bar Date for Filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to such requests must be Filed and served on the Plan Administrator and the requesting party by the later of (a) one hundred and twenty (120) days after the Effective Date and (b) sixty (60) days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

2.    *Professional Fee Claims*

All Entities seeking an award by the Bankruptcy Court of Professional Fee Claims (a) shall File their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such

amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Plan Administrator. The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval. Notwithstanding anything to the contrary in the Plan, Holders of Professional Fee Claims shall be paid solely from, and to the extent of amounts funded to, the Professional Fee Escrow Account (including amounts funded into the Professional Fee Escrow Account pursuant to the Approved Budget and/or the Wind Down Budget), in each case, pursuant to the DIP Orders and in accordance with the amounts set forth for such Claims in the Approved Budget and/or Wind Down Budget, as applicable.

3.      *Statutory Fees*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Plan Administrator shall pay any and all such fees when due and payable from the Wind Down Reserve. The Debtors shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Plan Administrator shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Disbursing Agent during the applicable period, attested to by an authorized representative of the Disbursing Agent. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

4.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid in full in Cash from the Wind Down Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim is Allowed; and (c) the date such Allowed Priority Tax Claim becomes due and payable in accordance with non-bankruptcy law. The Debtors shall pay Allowed Priority Tax Claims against the Debtors solely to the extent such funds are available under the Wind Down Budget.

**D.      CLASSIFICATION OF CLAIMS AND INTERESTS**

1.      *Class 1 – Other Priority Claims*

(a)      *Classification*: Class 1 consists of the Other Priority Claims.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the (A) Effective Date and (B) the first Business Day after thirty (30) days

from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practicable thereafter.

(c)     *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.     *Class 2 – Other Secured Claims*

(a)     *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are Secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Plan Administrator, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the first Business Day after thirty (30) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. For the avoidance of doubt, the Allowed amount of any Other Secured Claim shall be reduced if, and to the extent that any portion of such Claim is offset against the purchase price for the sale of any of the Debtors' assets either pursuant to section 363(k) of the Bankruptcy Code or otherwise.

(c)     *Voting*:  Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.     *Class 3 – Second Lien Term Loan Claims*

(a)     *Classification*:  Class 3 consists of the Second Lien Term Loan Claims.

(b)     *Treatment*:  Holders of Second Lien Term Loan Claims shall receive a *pro rata* share of the Initial Class 3 Distribution and the Final Class 3 Distribution.

(c)     *Voting*:  Class 3 is an Impaired Class, and the Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

US-DOCS\117184478.18

4. *Class 4 – General Unsecured Claims*

    (a)    *Classification*:  Class 4 consists of the General Unsecured Claims.

    (b)    *Treatment*:  In light of the fact that the Second Lien Term Loan Claims are Secured by valid and perfected Liens on all assets of the Debtors and are not anticipated to be satisfied in full, Holders of General Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims.

    (c)    *Voting*:  Class 4 is an Impaired Class.  Holders of General Unsecured Claims will receive no Distribution under the Plan on account of such Claims and are thus deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are, therefore, not entitled to vote to accept or reject the Plan.  **However, Holders of Class 4 General Unsecured Claims are encouraged to read Article V.D of the Plan and Article V.F.5 below regarding such Holders' ability to participate in the Release Consideration.**

5. *Class 5 – Intercompany Claims*

    (a)    *Classification*:  Class 5 consists of the Intercompany Claims.

    (b)    *Treatment*:  Holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims.

    (c)    *Voting*:  Class 5 is an Impaired Class.  Holders of Intercompany Claims will receive no Distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are, therefore, not entitled to vote to accept or reject the Plan.

6. *Class 6 – Intercompany Interests*

    (a)    *Classification*:  Class 6 consists of the Intercompany Interests.

    (b)    *Treatment*:  Upon the completion of the Wind Down pursuant to the Plan Administration Process, Intercompany Interests shall be cancelled and discharged, with the Holders of Intercompany Interests receiving no Distribution on account of such Intercompany Interests.

    (c)    *Voting*:  Class 6 is an Impaired Class.  Holders of Intercompany Interests will receive no Distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are, therefore, not entitled to vote to accept or reject the Plan.

7. *Class 7 – Existing LBD Interests*

    (a)    *Classification*:  Class 7 consists of the Existing LBD Interests.

(b)     *Treatment*:  On the Effective Date, the Existing LBD Interests will be cancelled without further notice to, approval of or action by any Entity.

(c)     *Voting*:  Class 7 is an Impaired Class.  Holders of Existing LBD Interests will receive no distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are, therefore, not entitled to vote to accept or reject the Plan.

8.     *Special Provisions Governing Unimpaired Claims*

Notwithstanding anything to the contrary in the Plan or other Definitive Documents, (i) each Unimpaired Claim shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan and (ii) the property of the Debtors' Estates shall not be free and clear of the right of the Holder of such Unimpaired Claim to enforce its contractual rights in respect of its Unimpaired Claim against the Post-Effective Date Debtors (including, for the avoidance of doubt, satisfying its Unimpaired Claim from such property, but solely to the extent the Holder of such Claim could have done so prior to the Petition Date), in each case, until such Claim has been (x) paid in full in accordance with applicable law, on terms agreed to between the Holder of such Claim and the Debtors or Post-Effective Date Debtors or in accordance with the terms and conditions of the particular transaction giving rise to such Claim or (y) otherwise satisfied or disposed of as determined by a court of competent jurisdiction.  The Debtors, the Post-Effective Date Debtors, the Plan Administrator, and any other Entity shall retain all defenses, counterclaims, rights to setoff and rights to recoupment, if any, as to Unimpaired Claims.  For the avoidance of doubt, the foregoing limitation shall not apply to (i) any Claims or Causes of Action held by a Debtor, its Estate or any Post-Effective Date Debtor that are released pursuant to Article X.B of the Plan (the "***Debtor Released Claims***") or (ii) any Claims or Causes of Action held by any Releasing Party that are released pursuant to Article X.C of the Plan (the "***Third Party Released Claims***"); *provided*, that, for the avoidance of doubt, the Third Party Released Claims shall not include any right of the Holder of such Unimpaired Claim to enforce its contractual rights in respect of its Unimpaired Claim against the Post-Effective Date Debtors as set forth herein or to enforce its contractual rights against any Affiliate of the Debtors that is contractually liable along with a Post-Effective Date Debtor with respect to such Holder's Unimpaired Claim; *provided further*, that the release of any Third Party Released Claim against any of the Related Persons of the Debtors and/or Post-Effective Date Debtors shall not take effect until (x) the Holder of such Third Party Released Claim has been paid in full on account of its Unimpaired Claim in accordance with applicable law on terms agreed to between the Holder of such Claim and the Debtors or Post-Effective Date Debtors or in accordance with the terms and conditions of the particular transaction giving rise to such Claim or (y) such Holder's Unimpaired Claim has been otherwise satisfied or disposed of as determined by a court of competent jurisdiction.  Debtor Released Claims and Third Party Released Claims shall be deemed settled, satisfied, resolved, released, discharged, barred and/or enjoined by the applicable provisions under, and pursuant to the express terms of, the Plan and other Definitive Documents on the Effective Date.

9. *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## E. ACCEPTANCE OR REJECTION OF THE PLAN

1. *Presumed Acceptance of Plan*

Classes 1 and 2 are Unimpaired under the Plan and are deemed to accept the Plan. Therefore, the Holders of Claims in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2. *Presumed Rejection of Plan*

Classes 4, 5, 6 and 7 are Impaired, and Holders of Claims or Interests in Classes 4, 5, 6 and 7 are not entitled to receive or retain any property under the Plan. Accordingly, under section 1126(g) of the Bankruptcy Code, the votes of Holders of Claims or Interests in Classes 4, 5, 6 and 7 will not be solicited, and such Holders are deemed to reject the Plan.

3. *Voting Class*

Class 3 is Impaired and entitled to vote under the Plan. The Holders of Claims in Class 3 as of the Voting Record Date are entitled to vote to accept or reject the Plan.

4. *Acceptance by Impaired Class of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class actually have voted to accept the Plan.

5. *Voting Class; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

6.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

7.      *Votes Solicited in Good Faith*

The Debtors have, and upon the Confirmation Date will be deemed to have, solicited votes on the Plan from the Voting Class in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the Solicitation. Accordingly, the Debtors and their respective Related Persons will be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

## F.      **MEANS FOR IMPLEMENTATION OF THE PLAN**

1.      *Transactions Effective as of the Effective Date*

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, their stockholders, or any other person or Entity.

2.      *Plan Administrator*

(a)      *Appointment*.  The Person designated in the Plan Supplement shall serve as Plan Administrator for each of the Debtors.

(b)      *Authority*.  Subject to Article V of the Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)      except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; *provided however* that the Plan Administrator shall only have authority to object to Class 4 General Unsecured Claims of a Holder who (i) has timely returned (and has not revoked or rescinded) an Opt-In Release Form in accordance with the Solicitation Procedures and has checked the box therein to approve the releases set forth in Article X.C of the Plan and (ii) has not objected to, or otherwise sought to

impede, confirmation of the Plan in the event that the Plan Administrator and Committee Trustee determine that the Release Consideration Trust shall not be formed;

(ii)     make Distributions to Holders of Allowed Claims in accordance with the Plan;

(iii)     exercise its reasonable business judgment to direct and control the Wind Down, liquidation, sale and/or abandoning of the remaining assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize Distributions to Holders of Allowed Claims;

(iv)     to the extent Causes of Action constitute Plan Administration Assets, prosecute all such Causes of Action on behalf of the Debtors, elect not to pursue any such Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors;

(v)     make payments to existing professionals who will continue to perform in their current capacities;

(vi)     retain professionals to assist in performing its duties under the Plan;

(vii)     maintain the books and records and accounts of the Debtors;

(viii)     invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Causes of Action, and any income earned thereon;

(ix)     incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(x)     take any and all actions on behalf of the Debtors to finalize the Purchase Price Allocation (as defined in the Asset Purchase Agreement) in accordance with the terms of the Asset Purchase Agreement;

(xi)     receive any additional funds as a result of the approved Purchase Price Allocation and distribute any such funds (if any) to the Second Lien Lenders in connection with the Initial Class 3 Distribution or Final Class 3 Distribution, as applicable;

(xii)     administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xiii) prepare and File any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xiv) create the Release Consideration Trust upon the request of the Committee Trustee, appoint the Committee Trustee as the Release Consideration Trustee, pay the Committee Trustee Expenses, and Release Consideration Trust Pre-Funding Expenses, and fund the Release Consideration Trust with the Release Consideration net of any Committee Trustee Expenses and Release Consideration Trust Pre-Funding Expenses;

(xv) pay Statutory Fees in accordance with Article II.A.3 of the Plan; and

(xvi) perform other duties and functions that are consistent with the implementation of the Plan.

3. *The Plan Administration Process*

On the Effective Date, the Debtors shall fund from their Cash on hand, including any remaining Net Sale Proceeds, (i) the Initial Class 3 Distribution and, to the extent not already funded, (ii) the Wind Down Reserve, which shall vest in the Debtors and their Estates pursuant to Article V.C of the Plan as Plan Administration Assets. On the Effective Date, the Plan Administrator shall have authority over the Plan Administration Assets as a plan administration officer pursuant to the Plan Administration Agreement. Except as otherwise provided in the Plan, as of the Effective Date, all assets that remain property of the Debtors' Estates after the closing of the Sale Transaction, including the Wind Down Reserve (the "***Plan Administration Assets***") shall vest in the Debtors' Estates for purposes of liquidating the Estates. As of the Effective Date, all assets vested as Plan Administration Assets and all assets dealt with in the Plan shall be free and clear of all Liens, Claims, and Interests but for the Prepetition Second Liens and except as otherwise further provided in the Plan or in the Confirmation Order. Notwithstanding anything to the contrary in the Plan, the Plan Administration Assets shall not include the Professional Fee Escrow Account, but shall include a reversionary interest in any portion of the Professional Fee Escrow Account not used to satisfy Professional Fee Claims in accordance with the terms of the Plan.

On the Effective Date, the Plan Administrator shall also have the power, right, and responsibility to conduct the Plan Administration Process (including the Wind Down) and to take possession of all books, records, and files of the Debtors and the Estates and provide for the retention and storage of such books, records, and files until such time as the Plan Administrator determines that retention of same is no longer necessary or required. The Plan Administrator is authorized and empowered to effect the dissolution of any of the Debtors as soon as practicable after the Effective Date without the need for any company action or approval, and neither the Debtors nor the Plan Administrator shall be required to pay any taxes or fees to cause such dissolution. On the Effective Date or as soon thereafter as is reasonably practicable, the Plan Administrator shall wind down the affairs of the Debtors and file final tax returns for the Debtors.

Upon substantial completion of the Plan Administration Process, the Plan Administrator shall remit the Final Class 3 Distribution to Holders of Allowed Claims in Class 3

and, if created, fund the Release Consideration Trust with the Release Consideration (net of any Committee Trustee Expenses and Release Consideration Trust Pre-Funding Expenses).

4. *Release Consideration*

The Debtors, the Second Lien Lenders, and the Committee have agreed to a potential recovery to be distributed on a pro rata basis to those Holders of Allowed Claims in Class 4 that have timely returned (and has not revoked or rescinded) an Opt-In Release Form in accordance with the Solicitation Procedures and have checked the box therein to approve the releases set forth in Article X.C of the Plan and have not objected to, or otherwise sought to impede, Confirmation of the Plan. This Release Consideration is defined in the Plan to mean (i) the first $500,000 of savings from the Wind Down Budget, which would otherwise be available as part of the Initial Class 3 Distribution and (ii) 50% of the next $1 million in savings from the Wind Down Budget that would otherwise be available as part of the Final Class 3 Distribution, up to an additional $500,000, it being understood that the maximum amount of Release Consideration is no greater than $1 million. Notwithstanding anything to the contrary contained in the Plan, any fees or expenses associated with the reconciliation of Class 4 Claims and the distribution of the Release Consideration to Holders of Allowed Claims in Class 4 shall be payable solely from, and act as a reduction toward, the Release Consideration. As such, although Holders of Allowed Class 4 General Unsecured Claims are not entitled to, and will not be receiving, Distributions under the Plan, such Holders may participate in the Release Consideration, pursuant to the terms of the Plan. For the avoidance of doubt, the Second Lien Lenders shall not participate in the Release Consideration on account of any Second Lien Deficiency Claim.

Upon a determination by the Plan Administrator, in consultation with the Second Lien Lenders and Committee Trustee, that the Release Consideration is likely to exceed $500,000, the Committee Trustee shall request that the Plan Administrator create the Release Consideration Trust, and the Committee Trustee shall be appointed Release Consideration Trustee. For the avoidance of doubt, no Release Consideration Trust shall be created unless the Plan Administrator determines, in consultation with the Second Lien Lenders and Committee Trustee, that the Release Consideration is likely to exceed $500,000.

Except to the extent Class 4 General Unsecured Claims have been previously Allowed, the Release Consideration Trustee shall control and effectuate the Class 4 General Unsecured Claims reconciliation process, including objecting to, seeking to subordinate, compromising or settling any and all Class 4 General Unsecured Claims. The Release Consideration Trustee shall determine, in his, her or its sole discretion, whether a Holder of such Claims is entitled to participate in the Release Consideration based on whether such Holder has (i) Filed a valid General Unsecured Claim, (ii) timely returned (and not revoked or rescinded) an Opt-In Release Form in accordance with the Solicitation Procedures and checked the box therein to approve the releases set forth in Article X.C of the Plan and (iii) not objected to, or otherwise impeded, confirmation of the Plan; *provided*, *however*, that the Release Consideration Trustee shall not permit any Holder of a Class 4 Claim to participate in the Release Consideration if such Holder (x) Files or otherwise asserts in these Chapter 11 Cases any objection to the Plan or (y) rescinds any Third Party Release given at or prior to the Effective Date.

Any Release Consideration Pre-Funding Expenses funded out of the Wind Down Reserve shall reduce, dollar-for-dollar, the Release Consideration funded into the Release Consideration Trust. After the Release Consideration Trust is funded, the Release Consideration Post-Funding Expenses shall be borne by the Release Consideration Trust. The Release Consideration Trustee shall have the same rights and powers as the Plan Administrator, as applicable, and as they pertain to the Release Consideration Trust. Article VII of the Plan, Provisions Governing Distributions, and Article VIII, Procedures for Resolving Contingent, Unliquidated, and Disputed Claims, shall apply, as applicable, to the Release Consideration Trust and Release Consideration Trustee, notwithstanding that the Release Consideration Date shall not otherwise be considered a Distribution under the Plan.

5. *Merger of Debtors; Closing Cases of Debtor Affiliates*

On the Effective Date: (i) all of the Debtor Affiliates shall be merged into Lucky Brand and the Plan Administrator may dissolve such Debtor Affiliates and complete the winding up of such Debtor Affiliates without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities; (ii) all Claims Filed or scheduled in the Debtor Affiliates' cases shall be deemed to have been Filed in the Chapter 11 Case of Lucky Brand; and (iii) the Chapter 11 Cases of the Debtor Affiliates shall be closed. In the discretion of the Debtors, after the Effective Date, Lucky Brand may engage in any other transaction in furtherance of the Plan. Any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors.

6. *Corporate Action*

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

7. *Exemption from Certain Transfer Taxes*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform

Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

8. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

9. *Directors, Managers, and Officers of the Debtors*

Following the Confirmation Date and prior to the occurrence of the Effective Date, the then-current officers, directors and managers of each of the Debtors shall continue in their respective capacities in accordance with the applicable by-laws or other organizational documents and the Debtors shall execute such documents and take such other action as is necessary to effectuate the actions provided for in the Plan.

On and after the Effective Date, the Plan Administrator shall serve as the sole shareholder, interest holder, officer, director or manager of each of the Debtors, as applicable, under applicable state law. The Plan Administrator, subject to the terms and conditions of the Plan and the Plan Administration Agreement, shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

10. *Insurance Policies*

Before the Petition Date, the Debtors obtained the D&O Tail Coverage covering claims asserted against the current and former directors and officers, based upon acts prior to the Effective Date. For six years following the Effective Date, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the benefits of the D&O Tail Coverage, subject to and in accordance with the applicable terms and conditions.

On the Effective Date, the Debtors' rights under and to each Insurance Policy shall vest in their Estates as part of the Plan Administration Assets. Confirmation and Consummation of the Plan, and the vesting of the Insurance Policies in the Debtors' Estates, shall not impair or otherwise affect (x) any parties' rights to coverage thereunder, including in respect of any claims pending as of the Effective Date or pursued or made thereafter, or (y) any available defenses of the Debtors or any Insurer under the Insurance Policies.

US-DOCS\117184478.18

11.    *Preservation of Rights of Action*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan, or otherwise transferred to Purchaser pursuant to the Sale Transaction, or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

12.    *Closing of the Lucky Brand Case*

After the Chapter 11 Case of Lucky Brand has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close Lucky Brand's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## G.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.    *Assumption and Assignment of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, as of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale Transaction, and are not the subject of a pending motion to reject, assume, or assume and assign as of the Effective Date, (2) are not identified on the Schedule of Assumed Contracts to be Filed with the Plan Supplement, and (3) have not expired under their own terms prior to the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

2.    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the

Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

3.    *Rejection Damages Claims*

All Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan must be Filed with the Balloting Agent and served upon the Plan Administrator and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date; *provided*, that the foregoing deadline shall apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of Article VI.A of the Plan, and the deadline for filing any rejection damage Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to separate Court order shall be the applicable deadline under the Bar Date Order. Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a General Unsecured Claim against the applicable Debtor.

4.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## H.    PROVISIONS GOVERNING DISTRIBUTIONS

1.    *Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions; Funding of Disbursements*

(a)    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered before, on or at any time after the Effective Date.

(b)    Entitlement to Distributions

On and after the Effective Date, the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Plan Record Date. Accordingly, the Disbursing Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Plan Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Plan Record Date.

(c)     Funding of Disbursements

All Distributions under this Plan to Holders of Allowed Claims (other than Allowed Class 3 Claims and Allowed Professional Fee Claims) shall made solely from the Wind Down Reserve. Distributions on account of Allowed Professional Fee Claims shall be made from the Professional Fee Escrow Account.

2.     *Disbursing Agent*

Except as otherwise provided herein, all Distributions under the Plan shall be made by the Debtors as Disbursing Agent or such other Entity designated by the Debtors as a Disbursing Agent on the Effective Date, which may be the Plan Administrator.

(a)     The Disbursing Agents shall only be required to act and make Distributions in accordance with the terms of the Plan. Except on account of gross negligence, fraud, illegality or willful misconduct, such parties shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Plan Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

3.     *Distributions on Account of Claims Allowed After the Effective Date*

(a)     Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

US-DOCS\117184478.18

(b)    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Disbursing Agent, (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.  Any dividends or other Distributions arising from property distributed to Holders of Allowed Claims, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other Distributions were earlier paid to Holders of Allowed Claims in such Class.

4.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

(a)    Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (a) such Holders' address on its Proof of Claim, if applicable, (b) such Holders' address listed on a notice Filed with the Bankruptcy Court, if applicable, or (c) if neither (a) or (b) are available, the address of record for the Holder listed on the Debtors' Schedules.

(b)    Undeliverable Distributions and Unclaimed Property

(i)    Failure to Claim Undeliverable Distributions

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided*, *however*, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date the Distribution was returned.  After such date, all unclaimed property or interests in property shall revert to the Plan Administrator (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

(ii)    Failure to Present Checks

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the issuance of such check shall have its Claim for such un-negotiated check discharged and shall be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Estates.  In such

cases, any Cash held for payment on account of such Claims shall be Plan Administration Assets free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5.      *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Disbursing Agent reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Debtors, the Plan Administrator, the Release Consideration Trustee, or the Disbursing Agent may require, as a condition to the receipt of a Distribution, that a Holder furnish to the Debtors, Plan Administrator, Release Consideration Trustee, or Disbursing Agent, as applicable, any necessary or appropriate tax documentation, including IRS Form W-8 or IRS Form W-9, as applicable to each Holder. If any Holder fails to comply with such a request within three (3) months or, with respect to the Release Consideration, otherwise fails to establish a complete exemption from withholding, such Distribution in respect of such Holder may be withheld as required by applicable law and in such event, shall be deemed an undeliverable Distribution and shall be treated in accordance with Article VII.D.2 of the Plan. Without limitation of the generality of the foregoing, the Debtors, the Plan Administrator, Release Consideration Trustee, or the Disbursing Agent may condition any Distribution it may make to a Holder on such entity's receipt of such information and documentation as the Debtors, the Plan Administrators, Release Consideration Trustee, or the Disbursing Agent, as applicable, determines in its discretion is necessary to effect a Distribution in accordance with applicable law, including tax law, and withhold, as required by applicable law, a Distribution to any Holder who fails to provide such documentation and information.

6.      *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any Distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein.

7.      *Claims Paid or Payable by Third Parties*

(a)      <u>Claims Paid by Third Parties</u>

The Debtors, the Plan Administrator, or Release Consideration Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed upon order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Plan Administrator, or Release Consideration Trustee. To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, the Plan Administrator, or Release Consideration Trustee, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administrator to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Distribution Date.

(b) <u>Claims Payable to Third Parties</u>

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon payment from such Insurers, such Claim may be expunged upon an order or approval of the Bankruptcy Court or deemed satisfied in full.

(c) <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against the Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

8. *Allocation of Plan Distributions between Principal and Interest*

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (or original issue discount).

9. *Objection Deadline*

Except as otherwise set forth in the Plan, the Plan Administrator, the Release Consideration Trustee, and Post-Effective Date Debtors shall File all objections to Disputed Claims or Interests, and shall File all motions to estimate Claims under section 502(c) of the Bankruptcy Code, on or before the Claims Objection Deadline. The Post-Effective Date Debtors may request that the Bankruptcy Court extend the Claims Objection Deadline, and the Plan Administrator, the Committee Trustee, and Release Consideration Trustee, as applicable, may request that the Bankruptcy Court extend the Claims Objection Deadline with respect to Class 4 Claims.

US-DOCS\117184478.18

10.    *De Minimis Distributions*

If a Distribution under the Plan would be less than $25.00, the Disbursing Agent may cancel such Distribution and allocate such amount *pro rata* to any Allowed Claims with Distributions in excess of such threshold. Any such cancelled Distributions shall be treated as unclaimed property under Article VII.D.2 of the Plan. To the extent that the Plan Administrator or Release Consideration Trustee, respectively, have assets remaining that do not exceed $5,000 in value, the Plan Administrator or Release Consideration Trustee, in their discretion, can donate such assets to a charitable organization of its choice.

## I.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

1.    *Allowance and Disallowance of Claims*

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Sale Order and the Confirmation Order), the Plan Administrator after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

2.    *Prosecution of Objections to Claims*

The Plan Administrator or Release Consideration Trustee, as applicable, shall have the authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Plan Administrator or Release Consideration Trustee, as applicable, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Plan Administrator or Release Consideration Trustee, as applicable, may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary; *provided*, *however*, that for the avoidance of doubt, the underlying Claim shall remain under the jurisdiction of the Bankruptcy Court and shall not be Disallowed other than by order of the Bankruptcy Court.

With respect to the foregoing duties of the Plan Administrator and Release Consideration Trustee, as applicable, to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims, the Plan Administrator or Release Consideration Trustee, as the case may be, shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege, and the Plan Administrator or Release Consideration Trustee, as applicable, shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

3.    *Estimation of Claims*

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code,

US-DOCS\117184478.18

regardless of whether the Plan Administrator has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the applicable Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

4. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

**J.** **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

1. *Conditions Precedent to Confirmation*

*Unless satisfied or waived pursuant to the provisions of Article IX.C of the Plan, the following are conditions precedent to Confirmation of the Plan.*

(a) All provisions, terms, and conditions of the Plan are approved in the Confirmation Order.  The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Debtors.  The Confirmation Order shall provide that, among other things, the Plan Administrator is authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the other contracts, instruments and other agreements or documents created in connection with or described in the Plan.

2. *Conditions Precedent to the Effective Date*

*Unless satisfied or waived pursuant to the provisions of Article IX.C of the Plan, the following are conditions precedent to the occurrence of the Effective Date of the Plan.*

(a) The Plan, the Definitive Documents, and all other documents contemplated thereby, including any amendments, modifications, or supplements thereto, shall be acceptable to the Debtors.

(b)     All Definitive Documents shall have been executed, delivered, Filed (if applicable) and shall be in full force and effect, and all conditions precedent to effectiveness set forth in the Definitive Documents shall have been satisfied or waived in accordance with the terms thereof.

(c)     The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan and the Definitive Documents and no order, injunction or judgment shall have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare illegal the transactions contemplated by the Plan, and no law shall have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by the Plan.

(d)     The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Debtors and shall be a Final Order.  The Confirmation Order shall provide that, among other things, the Plan Administrator is authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the other contracts, instruments and other agreements or documents created in connection with or described in the Plan.

(e)     The Plan Administration Agreement shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

(f)     All actions, documents, certificates, and agreements necessary to implement the Plan shall (i) have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect.

(g)     The Prior First Payment shall have been distributed to the First Lien Agent, which payment shall be unconditionally and fully vested in, and not subject to any clawback from, the First Lien Agent.

(h)     The Prior Second Lien Payment shall have been distributed to the Second Lien Lenders, which payment shall be unconditionally and fully vested in, and not subject to any clawback from, the Second Lien Lenders.

(i)     All Second Lien Lender Fees shall have been paid in full.

3.     *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtors in their sole discretion, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

4. *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## K. RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

1. *General*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, any Distribution to be made on account of such Allowed Claim or Allowed Interest, including, without limitation, all controversies among the Debtors, the First Lien Agent, the First Lien Lenders, the Second Lien Agents, the Second Lien Lenders, the DIP Lenders, the Committee, and all other Holders of Claims against and Interests in the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against them and Causes of Action against other Entities.

2. *Debtor Release*

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Post-Effective Date Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Persons that may purport to assert any Causes of Action derivatively, by or through the foregoing Persons, from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or**

US-DOCS\117184478.18

unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Post-Effective Date Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the Sale Transaction, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Debtors' in or out-of-court restructuring and recapitalization efforts, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Transaction, the Sale Order, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission.

Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

3.     *Release by Holders of Claims and Interests*

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Sale Transaction, the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the

US-DOCS\117184478.18

purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Debtors' in or out-of-court restructuring and recapitalization efforts, intercompany transactions between or among a Debtor and another Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Transaction, the Sale Order, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission.

Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

4. *Exculpation*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and consummation of the Plan, making Distributions, implementing the Plan Administration Process, the Disclosure Statement, the Sale Transaction, the Asset Purchase Agreement, the Sale Order, or the solicitation of votes for, or Confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors; or the transactions in furtherance of any of the foregoing; other than (i) Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations under the Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on the Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or Distributions made pursuant to the Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

5. *Permanent Injunction*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released

pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

6.      *Setoffs*

Except as otherwise expressly provided for in the Plan, each Debtor and the Plan Administrator, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any Distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such Claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor of any such Claims, rights and Causes of Action that such Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.  For the avoidance of doubt, the Filing of a Proof of Claim is sufficient to preserve a right of setoff hereunder.

7.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Debtor and its successor and assigns.

8.      *Preservation of All Causes of Action Not Expressly Settled or Released*

The Debtors expressly reserve all Causes of Action not already transferred to the Purchaser pursuant to the Sale Order for later adjudication by, as applicable, the Debtors or the Plan Administrator (including, without limitation, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the Confirmation or Consummation of the Plan based on this Disclosure Statement, the Plan, or the Confirmation Order, except in each case where such

Causes of Action have been expressly waived, relinquished, released, compromised or settled in the Plan (including, without limitation, and for the avoidance of doubt, the Debtor Release contained in Article X.B of the Plan, the Third-Party Release contained in Article X.C of the Plan and the Exculpation contained in Article X.D of the Plan) or any other Final Order (including, without limitation, the Sale Order or the Confirmation Order). In addition, the Debtors and the Plan Administrator, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

9. *Post-Effective Date Personnel*

In addition to (i) the exculpation provided in Article X.D of the Plan and (ii) the limitations of liability for the Plan Administrator provided in the Plan Administration Agreement and hereunder, the directors, officers, managers, and employees of the Post-Effective Date Debtors serving after the Effective Date shall incur no personal liability to any Entity for any act or commission in connection with, arising out of, or relating to, their administration of the Plan and Dstributions under the Plan, any reserves created under the Plan, or in connection with the affairs of the Post-Effective Date Debtors unless related to an action or omission that is determined in a Final Order to have constituted gross negligence, fraud, illegality or willful misconduct. The Post-Effective Date Debtors shall indemnify such directors, officers, managers and employees serving after the Effective Date for any losses, claims, costs, damages or liabilities resulting from such Person's service in such a capacity at any time from and after the Petition Date, unless related to an action or omission that is determined in a Final Order to have constituted gross negligence, fraud, illegality or willful misconduct. The Bankruptcy Court shall retain exclusive jurisdiction over any action or proceeding in connection with, arising out of, or related to their service as directors, officers, or employees of the Post-Effective Date Debtors (from and after the Effective Date). No action or proceeding may be commenced against the directors, officers, or employees of the Post-Effective Date Debtors serving from and after the Effective Date in connection with, arising out of, or relating to their service as directors, officers, or employees from and after the Effective Date without approval of the Bankruptcy Court.

10. *Integral Part of Plan*

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

## L. <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible, including, without limitation, jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest;

(b)     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)     resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising;

(d)     resolve any issues related to any matters adjudicated or otherwise subject to a Final Order in the Chapter 11 Cases;

(e)     ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(f)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(g)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or this Disclosure Statement;

(h)     resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Person or Entity's obligations incurred in connection with the Plan;

(i)     hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

(j)     hear and determine disputes arising in connection with the interpretation, implementation, enforcement of the Asset Purchase Agreement or other document(s) governing or relating to the Asset Purchase Agreement;

(k)     issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan;

(l)     enforce the terms and conditions of the Plan, the Confirmation Order, and the Definitive Documents;

US-DOCS\117184478.18

(m)     resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, the indemnification and other provisions contained in Article X of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

(n)     enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(o)     resolve any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with the Plan; and

(p)     enter an order concluding or closing the Chapter 11 Cases.

## M.     **MISCELLANEOUS PROVISIONS**

1.     *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Filing of the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan or this Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

2.     *Payment of Statutory Fees*

All fees payable pursuant to section 1930 (a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code to the extent necessary, shall be paid by each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

3.     *Statutory Committee*

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve; *provided*, *however*, that following the Effective Date, the Committee will continue in existence and have standing and a right to be heard for the following limited purposes: (i) pursuing claims and final fee applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code in accordance with Article II.A of the Plan; and (ii) any appeals of the Confirmation Order or other appeal to which the Committee is a party.  Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective

attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity. Upon dissolution of the Committee, the Committee Trustee shall be appointed and shall determine whether to request from the Plan Administrator creation of the Release Consideration Trust. The Committee Trustee shall be entitled to Committee Trustee Expenses. In the event the Release Consideration Trust is created, the Committee Trustee shall be appointed Release Consideration Trustee and the Release Consideration Trustee shall be entitled to Release Consideration Trust Expenses.

        4.     *Modification of Plan*

Subject to the limitations and rights contained in the Plan: (a) the Debtors reserve the right, after consultation with the Second Lien Lenders and the Committee, and in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order in accordance with section 1127(a) of the Bankruptcy Code and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, and after consultation with the Second Lien Lenders and the Committee, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code. A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

        5.     *Revocation or Withdrawal of Plan*

The Debtors reserve the right, after consultation with the Second Lien Lenders and the Committee, to revoke or withdraw the Plan prior to the Effective Date and/or to File subsequent chapter 11 plans, with respect to one or more of the Debtors. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which the Plan was revoked or withdrawn or for which Confirmation or Consummation of the Plan did not occur: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

        6.     *Successors and Assigns*

The Plan will be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns. The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

7. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Plan is Consummated. Neither the Filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by the Debtors or any other Entity with respect to the Plan will be or will be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Interests or other Entities; or (2) any Holder of a Claim or an Interest or other Entity prior to the Effective Date.

8. *Further Assurances*

The Debtors, all Holders of Claims receiving Distributions hereunder, and all other Entities will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

9. *Severability*

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

10. *Service of Documents*

Any notice, direction or other communication given regarding the matters contemplated by the Plan (each, a "***Notice***") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed as follows:

**If to the Debtors**:

        Lucky Brand Dungarees, LLC
        540 South Santa Fe Ave.
        Los Angeles, CA 90013
        Attn: Christopher Cansiani
            Maryn Miller
        Telephone:  (213) 485-1234
        Facsimile:  (213) 891-8763
        Email:  ccansiani@luckybrand.com
            mmiller@luckybrand.com

with a copy to:

        Latham & Watkins LLP
        355 South Grand Avenue, Suite 100
        Los Angeles, California 90071
        Attn:  Ted A. Dillman
            Christina M. Craige
        Telephone:  (213) 485-1234
        Facsimile:  (213) 891-8763
        Email:  Ted.Dillman@lw.com
            Chris.Craige@lw.com

**If to the Committee**:

        Pachulski Stang Ziehl & Jones LLP
        919 N Market Street  17th Floor
        Wilmington, DE 19801
        Attn:  Bradford J. Sandler
            Colin R. Robinson
            Paul J. Labov
        Telephone:  (302) 652-4100
        Facsimile:  (302) 652-4400
        Email:  bsandler@pszjlaw.com
            crobinson@pszjlaw.com
            plabov@pszjlaw.com

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Article.  Any party may change its address for

service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

11. *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Definitive Document or an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

12. *Tax Reporting and Compliance*

The Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

13. *Schedules*

All exhibits and schedules to the Plan, including the Exhibits and Plan Schedules, are incorporated in the Plan and are a part of the Plan as if set forth in full in the Plan.

14. *Conflicts*

Except as set forth in the Plan, to the extent that any provision of this Disclosure Statement or any order (other than the Confirmation Order or the Sale Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided*, that, in the event of any conflict with any provision of the Plan and/or the Confirmation Order with respect to the Sale Transaction, on the one hand, and the Sale Order, on the other hand, the Sale Order shall govern. In the event of a conflict between any provision of the Plan and the Confirmation Order, the Confirmation Order shall govern and control.

15. *No Strict Construction*

The Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Second Lien Lenders, the Committee, and their respective professionals. Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, the Plan, this Disclosure Statement, the Exhibits and the Plan Schedules, and the agreements and documents ancillary or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "*contra proferentem*" or other rule of strict construction will not apply to the construction or interpretation of any provision of the Plan, this Disclosure Statement, the Exhibits or the Plan Schedules, or the documents ancillary and related thereto.

16.     *Entire Agreement*

Except as otherwise provided therein, the Plan and the Definitive Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and the Definitive Documents.

17.     *2002 Notice Parties*

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

# VI.
# CERTAIN RISK FACTORS AFFECTING THE DEBTORS

Prior to voting to accept or reject the Plan, Holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

## A.     CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.     *General*

While the Debtors believe that the Chapter 11 Cases will be efficient and will not be materially harmful to the value of their assets, the Debtors cannot be certain that this will be the case. Further, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the amount of distributable value available to Holders of Claims.

2.     *Parties in Interest May Object to Debtors' Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.     *The Debtors May Fail to Satisfy the Voting Requirements*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter,

confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

4.      *The Debtors May Not Be Able to Secure Confirmation of the Plan*

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that the Classes entitled to vote do not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation were not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent chapter 11 plan.

5.      *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur within fourteen (14) calendar days after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX.C of the Plan, then the Confirmation Order may be vacated, in which event no Distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

6.      *Conversion to Chapter 7 Cases or Dismissal of Chapter 11 Cases*

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of Holders of Claims and Interests, the Chapter 11 Cases may be dismissed or converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for Distribution in accordance with the priorities established by the Bankruptcy Code. See the Liquidation Analysis located

below, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims.

If the Chapter 11 Cases were dismissed, it is unclear what recoveries Holders of Claims would ultimately receive. Recoveries under non-bankruptcy law could be affected by a variety of contingencies and there can be no assurance that such recoveries would be similar or more favorable than recoveries under the Plan. The Debtors believe that the recoveries Holders of Claims would receive outside of the Chapter 11 Cases would be smaller than those provided under the Plan because of delay resulting from the dismissal of the case and expenses associated with exercising remedies under non-bankruptcy law.

7. *Risk of Re-solicitation of the Plan*

There can be no assurance that the Bankruptcy Court will not require modifications to the Plan that would necessitate re-solicitation of votes from the Voting Class. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan in the event votes are re-solicited. Re-solicitation could delay confirmation of the Plan, and if the Plan is not confirmed, it is unclear what Distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan or other proceeding.

8. *Releases, Injunctions and Exculpation Provisions May Not be Approved*

The Plan provides for certain releases, injunctions, and exculpations. However, such releases, injunctions, and exculpations are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may not support the Plan.

9. *Risk Related to the DIP Orders*

In the event of a breach of one of the milestones or another event of default under the DIP Orders, the Second Lien Lenders may seek, among other things, to exercise certain remedies with respect to the collateral securing the Second Lien Term Loans, and to take certain other actions against the Debtors.

## B.     ADDITIONAL FACTORS TO BE CONSIDERED

1. *Debtors Could Withdraw Plan*

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

2. *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the Petition Date, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3. *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

4. *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice. Each Holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5. *No Admission Made*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

6. *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7. *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

8. *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure

Statement, they have not independently verified the information contained in this Disclosure Statement.

9.      *Certain Material U.S. Federal Income Tax Consequences*

For a discussion of certain material U.S. federal income tax consequences to certain holders of Claims in connection with the implementation of the Plan, see Article VII hereof.

# VII.
# CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.      <u>IN GENERAL</u>

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "**Service**"). There can be no assurance that the Service will not take a contrary view or that such a contrary view would not be sustained by a court. No ruling from the Service has been or will be sought, nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth in the Plan. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to U.S. Holders (as defined below) or the Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described in the Plan.

The following summary is for general information only and, except for Article VII.C, is applicable only to U.S. Holders of Second Lien Term Loan Claims. The tax treatment of a U.S. Holder may vary depending upon such U.S. Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a U.S. Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a U.S. Holder that has made an agreement to resolve its Second Lien Term Loan Claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or to U.S. Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, partnerships and other pass-through entities, U.S. Holders that hold Second Lien Term Loan Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction, U.S. Holders that have a "functional currency" other than the United States dollar, U.S. Holders subject to special tax accounting rules as a result of any item of gross income with respect to the Second Lien Term Loan Claims being taken into account in an applicable financial statement, and U.S. Holders that have acquired Second Lien Term Loan Claims in connection with the performance of services.

The following summary assumes that the Second Lien Term Loan Claims are held by U.S. Holders as "capital assets" within the meaning of section 1221 of the IRC and that the Second Lien Term Loan Claims will be respected for U.S. federal income tax purposes in accordance with their form. The following summary also assumes that the Class 3 Distribution of Cash is not part of a "reorganization" for U.S. federal income tax purposes.

The tax treatment of U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Class 3 Distribution provided for by the Plan may vary, depending upon, among other things, whether the U.S. Holder receives such Distributions in more than one taxable year in which case a portion of such Distributions received in a succeeding tax year may be taxable as imputed interest. Therefore, each U.S. Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such U.S. Holder of the transactions contemplated by the Plan

The tax treatment of U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon, among other things, whether the U.S. Holder receives Distributions under the Plan in more than one taxable year. Therefore, each U.S. Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such U.S. Holder of the transactions contemplated by the Plan.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Second Lien Term Loan Claim that for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.

## B. CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE U.S. HOLDERS OF SECOND LIEN TERM LOAN CLAIMS

A U.S. Holder of a Second Lien Term Loan Claim should generally be treated as receiving the Class 3 Distributions of Cash and, if applicable, other property under the Plan in a taxable exchange under Section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount ("*OID*")), each U.S. Holder of Second Lien Term Loan Claims should recognize gain or loss equal to the difference between the (a) amount of Cash and fair market value of other property received in exchange for such Claim, and (b) such U.S. Holder's adjusted tax basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Second Lien Term Loan Claims will depend on such U.S. Holder's own circumstances and may be restricted under the IRC.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including (but not limited to): (a) the tax status of the U.S. Holder of the Second Lien Term Loan Claim; (b) whether such Claim has been held for more than one year; (c) the extent to which the U.S. Holder previously claimed a loss or bad debt deduction with respect to such Claim; and (d) whether such Claim was acquired at a market discount. A U.S. Holder that purchased its Second Lien Term Loan Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such U.S. Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

A portion of the consideration received by a U.S. Holder of a Second Lien Term Loan Claim may be attributable to accrued interest or OID on such Claim. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Second Lien Term Loan Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on such Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. If the fair value of the consideration is not sufficient to fully satisfy all principal, interest or OID on the Claims, the extent to which such consideration will be attributable to accrued interest and OID is unclear. The Debtors intend to take the position, and the Plan provides that, to the extent permitted by applicable law, the Class 3 Distributions in full or partial satisfaction of the Second Lien Term Loan Claims shall be allocated for income tax purposes first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued, including OID, on such Claims.

## C. BACKUP WITHHOLDING AND INFORMATION REPORTING

The Class 3 Distribution and any other payments to holders of Second Lien Term Loan Claims under the Plan are subject to any applicable tax withholding and applicable information reporting requirements. The IRS may make the information returns reporting such Distributions and payments and withholding available to the tax authorities in the country in which a non-U.S. beneficiary is resident. In general, information reporting requirements may apply to

such Distributions or payments. Additionally, a U.S. Holder of a Second Lien Term Loan Claim may be subject to backup withholding (currently at a rate of 24%) with respect to such Distributions or payments. Certain holders (including corporations) generally are not subject to backup withholding. A U.S. Holder that is not otherwise exempt generally may avoid backup withholding by providing such Holder's taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the U.S. Holder has not been notified by the Service that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the Service.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## VIII. CONFIRMATION OF THE PLAN

### A.  CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Court has scheduled the Confirmation Hearing to commence on [ ● ], 2020 at [ ● ] (prevailing Eastern Time) (or via telephonic or other electronic means, as the Bankruptcy Court may direct). The Confirmation Hearing may be adjourned from time-to-time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.  OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or property, the basis for the objection and the specific grounds therefor, and must be Filed with the Bankruptcy Court, with a copy to the chambers of The Honorable Christopher S. Sontchi, United States Bankruptcy Court for the District of Delaware, 824 N Market Street, Wilmington, DE 19801, together with proof of service thereof, and served upon the parties listed below so as to be received no later than the Plan Objection Deadline of **November 3, 2020 at 4:00 p.m. (prevailing Eastern Time)**:

| *Debtors* | *Counsel to the Debtors* |
|---|---|
| Lucky Brand Dungarees, LLC<br>540 South Santa Fe Ave.<br>Los Angeles, CA 90013<br>Attn:   Christopher Cansiani<br>         Maryn Miller | Latham & Watkins LLP<br>885 Third Avenue<br>New York, New York 10022<br>Attn:   George A. Davis<br>         Brian S. Rosen<br>         Jonathan J. Weichselbaum<br>Telephone:  (212) 906-1200<br>Facsimile:  (212) 751-4864<br>Email: George.Davis@lw.com<br>         Brian.Rosen@lw.com<br>         Jon.Weichselbaum@lw.com<br><br>-and-<br><br>Latham & Watkins LLP<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Attn:   Ted A. Dillman<br>         Christina M. Craige<br>Telephone:  (213) 485-1234<br>Facsimile:  (213) 891-8763<br>Email: Ted.Dillman@lw.com<br>         Chris.Craige@lw.com |
| **Office of the United States Trustee** | **Counsel to the Creditors' Committee** |
| 844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>Attn:   Juliet M. Sarkessian<br>Telephone:  (302) 573-6008<br>Facsimile:  (302) 573-6497 | Pachulski Stang Ziehl & Jones LLP<br>919 N Market Street, 17th Floor<br>Wilmington, DE 19801<br>Attn:   Bradford J. Sandler<br>         Colin R. Robinson<br>         Paul J. Labov<br>Telephone:  (302) 652-4100 |

| Email:  Juliet.M.Sardessian@usdoj.gov | Facsimile:  (302) 652-4400 |
| | Email: bsandler@pszjlaw.com |
| | crobinson@pszjlaw.com |
| | plabov@pszjlaw.com |

| ***Counsel to the Second Lien Lenders*** | |
| --- | --- |
| DLA Piper | Richard, Layton & Finger, PA |
| 1251 Avenue of the Americas | One Rodney Square |
| New York, NY 10020-1104 | 920 North King Street |
| Attn:   Tom Califano | Wilmington, DE 19801 |
| Shmuel M. Klahr | Attn:   Mark D. Collins |
| Daniel Simon | Telephone:  (302) 651-7700 |
| Telephone:  (212) 335-4500 | Facsimile:  (302) 651-7701 |
| Facsimile:  (212) 335-4501 | Email: collins@rlf.com |
| Email: thomas.califano@dlapiper.com | |
| shmuel.klahr@dlapiper.com | |
| daniel.simon@dlapiper.com | |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN

1.     *Requirements of Section 1129(a) of the Bankruptcy Code*

(a)     General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)     The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)     Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

US-DOCS\117184478.18

(v)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equityholders and with public policy.

(vi)     With respect to each Class of Claims or Interests, each Holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of "Best Interests Test".

(vii)     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

(viii)     Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority claims will be paid in full on the Effective Date.

(ix)     At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

(x)     Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. *See* "Feasibility Analysis" below.

(xi)     All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)     <u>Best Interests Test</u>

Section 1129(a)(7) of the Bankruptcy Code requires that any holder of an impaired claim or interest that does not vote to accept a proposed chapter 11 plan must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's assets were liquidated under chapter 7 of the Bankruptcy Code on the effective date of such plan.

The Debtors believe the Plan satisfies the best interest test because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make Distributions to creditors in accordance with the priorities established in the

Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any estate assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.

Following the payment of all administrative claims in full, unsecured creditors share *pro rata* in remaining proceeds in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all administrative expense claims, and secured and unsecured creditors are paid in full on their allowed claims.

As of the Effective Date, substantially all of the Debtors' assets will have been liquidated.  The DIP Orders and the Sale Order have confirmed that the Second Lien Lenders have Liens on the Debtors' remaining cash and assets.  Although the Plan effects the continued liquidation of the Debtors' assets and contemplates Distributions to creditors, the Debtors believe that the Plan provides a recovery to Holders of Allowed General Unsecured Claims that would be no less than such creditors would receive in a chapter 7 liquidation.  First, pursuant to the Plan, funds are available to pay administrative, priority tax and priority Claims pursuant to the Wind Down Budget.  In a chapter 7 liquidation, those Claims may not be paid because the remaining Second Lien Term Loan Claims are estimated to be significantly in excess of the assets of the Debtors' estates and all such assets are subject to the Second Lien Term Loan Claims.  Further, such Liens would not be subject to challenge or avoidance.  Finally, the Second Lien Lenders have agreed to afford the opportunity for the Release Consideration for those Holders of General Unsecured Claims in Class 4 who timely opt-in to the Third Party Releases contained in Article X.C of the Plan and do not otherwise object to, or impede confirmation of, the Plan.  The Release Consideration is contingent on confirmation, among other things, of the Plan and would not be available in a liquidation under chapter 7.  In addition, the fees and expenses in a chapter 7 case may be greater because, among other things, of the fees and expenses associated with a new bar date (*see* Bankruptcy Rules 1019(2) and 3002(c)).  It is also possible that, because of the need for a chapter 7 trustee to familiarize itself with the cases and its statutory commission, the fees and expenses of the trustee and its professionals may exceed the equivalent costs under the chapter 11 plan where the Post-Confirmation Debtors and their professionals are already familiar with the winding down of the estates (for these purposes, the Debtors assume that the costs of the Plan Administrator would be no more than the costs of a chapter 7 trustee with respect to the functions of the Plan Administration Trust).

(c)     Feasibility Analysis

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan.  The Plan provides for the Distribution of the proceeds from the sale of substantially all of the Debtors' assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

*Requirements of Section 1129(b) of the Bankruptcy Code*

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a Class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

(a)    <u>No Unfair Discrimination</u>

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan of reorganization does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

(b)    <u>Fair and Equitable Test</u>

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

(i)    *Secured Creditors*. With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (b) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

(ii)    *Unsecured Creditors*. With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)     Holders of Interests.  Inasmuch as the Plan provides that no Holder of Claims or Interests in any Class junior in priority to the Holders of Interests in Classes 6 and 7 will receive or retain any property under the Plan, the Plan satisfies the "fair and equitable" test with respect to all Interests.

The Debtors believe that the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes 4, 5, 6 and 7 are deemed to reject the Plan, because, as to each such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Class will receive or retain any property on account of the Claims or Interests in such Class.

(d)     Application to the Plan

As to any Class that may reject the Plan, the Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment, and such Class will either be paid in full, or no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

3.     *Alternative to Confirmation and Consummation of the Plan*

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best option for the Debtors and their estates and will maximize recoveries to parties-in-interest—assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan includes a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

(a)     Alternative Plan

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to File a chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan would also involve a liquidation of the Debtors' assets.  The Debtors, however, submit that the Plan, as described herein, enables their unsecured creditors to realize the most value under the circumstances.

(b)     Dismissal or Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be dismissed or converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for Distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The probable effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the "Best Interest Test" above.

The Debtors believe that liquidation under chapter 7 would result in smaller Distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the

appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases. Likewise, the Debtors believe that dismissal of the Chapter 11 Cases would result in smaller recoveries for Holders of Claims than recoveries under the Plan because of delay resulting from the dismissal of the Chapter 11 Cases and expenses associated with exercising remedies under non-bankruptcy law.

Substantially all of the Debtors' assets have been sold through the Debtors' Sale Transaction. The Debtors believe that the Plan provides a greater recovery to Holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims – in addition to the Release Consideration only available under the Plan – than would a chapter 7 liquidation, for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would both decrease the aggregate proceeds available to Holders of Claims and increase the magnitude of claims to those proceeds. Specifically, liquidating the Debtors' estates under the Plan likely provides Holders of Allowed Administrative Expense, Priority Tax and Other Priority Claims with payment in full, which would not be likely due to all-asset Liens securing the Second Lien Term Loan Claims, as well as additional fees and expenses that would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors and their estates. The Debtors believe that in liquidation under chapter 7, before creditors received any Distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets. Further, the Second Lien Lenders have a lien on all assets of the Debtors' Estates and have agreed pursuant to the Committee Settlement, to afford a potential recovery (i.e. the Release Consideration) to Holders of General Unsecured Claims who have opted into the Third Party Releases under the Plan. That recovery would be unavailable to such creditors in a chapter 7 liquidation.

US-DOCS\117184478.18

# IX.
# CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urges Holders of Impaired Claims in Class 3 (Second Lien Term Loan Claims) to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than the Voting Deadline, **November 3, 2020 at 4:00 p.m. (prevailing Eastern Time)**.

Dated: August 28, 2020
Wilmington, Delaware


Respectfully submitted,


By: */s/ Christopher Cansiani*
Name: Christopher Cansiani
Title: Chief Financial Officer